14-1051

## UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

———————————

MICHAELS STORES, INC.,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee.

———————————

Appeal from the United States Court of International Trade,
Case No. 12-cv-00146, Judge Jane A. Restani

## NONCONFIDENTIAL BRIEF OF PLAINTIFF-APPELLANT,
## MICHAELS STORES, INC.

Matthew R. Nicely
  *Counsel of Record*
Lynn G. Kamarck
Hughes Hubbard & Reed LLP
1775 I Street, N.W.
Washington, D.C. 20006
Tel: (202) 721-4646
Fax: (202) 729-4776

*Counsel for Plaintiff-Appellant
Michaels Stores, Inc.*

February 3, 2014

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

MICHAELS STORES, INC. v. UNITED STATES

No. 14-1051

**CERTIFICATE OF INTEREST**

Counsel for Plaintiff-Appellant Michaels Stores, Inc. certifies the following:

1.   The full name of every party or amicus represented by me is:

     Michaels Stores, Inc.

2.   The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

     Not Applicable

3.   All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

     Not Applicable

4.   The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Hughes Hubbard & Reed LLP:          Hogan Lovells US LLP:
Matthew R. Nicely                   Lewis E. Leibowitz
Lynn G. Kamarck                     Craig A. Lewis
Robert L. LaFrankie                 Eric B. Gillman
Alexandra B. Hess                   Wesley V. Carrington


February 3, 2014                            */s/ Matthew R. Nicely*
Date                                        Signature of Counsel

i

# **TABLE OF CONTENTS**

Page

CERTIFICATE OF INTEREST ................................................................................. i

TABLE OF AUTHORITIES.................................................................................. iv

STATEMENT OF RELATED CASES ................................................................ 1

JURISDICTIONAL STATEMENT........................................................................ 1

STATEMENT OF THE ISSUE ........................................................................... 2

STATEMENT OF THE CASE .............................................................................. 3

STATEMENT OF FACTS...................................................................................... 4

I.      2008-2009 Period of Review ........................................................................ 5

II.     2009-2010 Period of Review ........................................................................ 8

III.    Commerce's Automatic Assessment System Makes Liquidation Rates
        Dependent on Deposit Rates........................................................................... 8

IV.     Cash Deposit Rates ....................................................................................... 10

V.      Liquidation at 114.90 Percent PRC-Wide Rate as Opposed to
        Producer Rate ................................................................................................. 12

SUMMARY OF ARGUMENT............................................................................. 14

STANDARD OF REVIEW.................................................................................... 15

ARGUMENT ....................................................................................................... 16

I.      Commerce Did Not Comply with the Provisions of 19 C.F.R. §
        351.107(b)(2) .................................................................................................. 16

II.     19 C.F.R. § 351.107(b)(2) Unambiguously Applies to All
        Antidumping Determinations, Including NME Determinations.................. 18

III.    The Preamble to 19 C.F.R. § 351.107(b)(2) Does Not Modify the
        Regulation ...................................................................................................... 22

**TABLE OF CONTENTS**
(Continued)

Page

IV.   The CIT's Position that the PRC-Wide Rate Serves as a
      Noncombination Rate Is Not Supported by Law .......................................... 25

V.    Even if the Regulation Were Ambiguous, Commerce's Interpretation
      Deserves No Deference Because Commerce Has Not Consistently
      Applied the Regulation ............................................................................... 27

VI.   Upholding Commerce's Interpretation Amounts to Allowing the
      Agency to Amend its Regulations Without Following the APA
      Requirements ............................................................................................... 30

VII.  Commerce's Interpretation Would Be Unfair to Importers Such as
      Michaels Who Justifiably Relied on the Plain Language of the
      Regulation ................................................................................................... 32

CONCLUSION AND RELIEF REQUESTED ...................................................... 34

CERTIFICATE OF SERVICE ............................................................................... 36

CERTIFICATE OF COMPLIANCE ...................................................................... 37

ADDENDUM .......................................................................................................... 38

CONFIDENTIAL MATERIAL OMITTED

The material omitted on page 3 describes the specific antidumping duties rates
deposited by Michaels that were applicable to identified producers; the material
omitted on page 4 describes the process through which Michaels buys cased
pencils from China; the material omitted on page 5 describes how Michaels
learned of a producer's identity; the material omitted on page 6 describes the
exporters from which Michaels received cased pencils and Commerce's
confidential liquidation instructions; the material omitted on page 8 describes the
exporters from which Michaels received cased pencils; the material omitted on
page 12-13 describes CBP's liquidation instructions as they related to Michaels;
the material omitted on page 17 characterizes importers included within
Commerce's review.

# TABLE OF AUTHORITIES

Page

**Cases**

*Addison v. Holly Hill Fruit Products, Inc.*,
  322 U.S. 607 (1944) .............................................................................. 32

*Amanda Foods (Viet.) Ltd. v. United States*,
  647 F. Supp. 2d 1368 (Ct. Int'l Trade 2009) ...................................... 21

*American Airlines, Inc. v. United States*,
  551 F.3d 1294 (Fed. Cir. 2008) ........................................................... 18

*Atlantic Sugar, Ltd. v. United States*,
  744 F. 2d 1556 (Fed. Cir. 1984) .......................................................... 16

*Bowles v. Seminole Rock & Sand Co.*,
  325 U.S. 410 (1945) .............................................................................. 18

*Caminetti v. United States*,
  242 U.S. 470 (1917) .............................................................................. 16

*Christensen v. Harris County*,
  529 U.S. 576 (2000) ........................................................................ 18, 31

*Christopher v. SmithKline Beecham Corp.*,
  132 S. Ct. 2156 (2012) ......................................................................... 28

*Consolidated Bearings Co. v. United States*,
  348 F.3d 997 (Fed. Cir. 2003) ............................................................... 2

*Decker v. Nw. Envtl. Def. Ctr.*,
  133 S. Ct. 1326 (2012) ......................................................................... 27

*Desert Palace, Inc. v. Costa*,
  539 U.S. 90 (2003) .......................................................................... 16, 18

*Ernst & Ernst v. Hochfelder et al.*,
  425 U.S. 185 (1976) .............................................................................. 32

*Eurodif, S.A. v. United States*,
   411 F. 3d 1355 (Fed. Cir. 2005) .......................................................................... 15

*Exportal Ltda. v. United States*,
   902 F. 2d 45 (D.C. Cir. 1990) ............................................................................ 31

*Federal-Mogul Corp. v. United States*,
   822 F. Supp. 782 (Ct. Int'l Trade 1993) ............................................................. 10

*Gates & Fox Co., Inc. v. Occupational Safety
and Health Review Comm'n*,
   790 F.2d 154 (D.C. Cir. 1986) ........................................................................... 28

*Gold East Paper (Jiangsu) Co., Ltd. v. United States*,
   Slip Op. 13-74, 2013 WL 2996231
   (Ct. Int'l Trade June 17, 2013) ........................................................................... 31

*Michaels Stores, Inc. v. United States*,
   Ct. No. 11-00137
   (Ct. Int'l Trade filed Aug. 18, 2011) ..................................................................... 1

*Michaels Stores, Inc. v. United States*,
   Ct. No. 12-00145
   (Ct. Int'l Trade filed May 23, 2012) ...................................................................... 1

*Michaels Stores, Inc. v. United States*,
   No. 12-00146, 2012 WL 6720675
   (Ct. Int'l Trade Dec. 27, 2012) ......................................................................... 1, 2

*Michaels Stores, Inv. v. United States*,
   Slip Op. 13-110, No. 12-00146
   (Ct. Int'l Trade Aug. 21, 2013) ................................................................... *passim*

*Pavelic & LeFlore v. Marvel Entm't Grp*,
   493 U.S. 120 (1989) .......................................................................................... 31

*Roberto v. Dep't of Navy*,
   440 F.3d 1341 (Fed. Cir. 2006) .......................................................................... 23

*Rubin v. United States*,
   449 U.S. 424 (1981) .......................................................................................... 18

*Shinyei Corp. of Am. v. United States*,
  355 F.3d 1297 (Fed. Cir. 2004)............................................................................ 2

*Target Corp. v. United States*,
  Slip Op. 10-141, Ct. No. 10-00353,
  2010 Ct. Int'l Trade LEXIS 146, at *2
  (Ct. Int'l Trade Dec. 23, 2010).......................................................................... 29

*Transcom, Inc. v. United States*,
  182 F. 3d 876 (1999)...............................................................................33, 34

*Tung Mung Dev. Co., Ltd. v. United States*,
  25 C.I.T. 752 (2001)......................................................................................... 23

*United States v. Mead Corp.*,
  533 U.S. 218 (2001)......................................................................................... 28

*Viraj Group v. United States*,
  476 F.3d 1349 (Fed. Cir. 2007)........................................................................ 18

*Walgreen Co. v. United States*,
  Slip Op. 10-142, Ct. No. 10-00373,
  2010 Ct. Int'l Trade LEXIS 145, at *1
  (Ct. Int'l Trade Dec. 23, 2010).......................................................................... 29

*Zerilli v. Evening News Ass'n*,
  628 F.2d 217 (D.C. Cir. 1980) ......................................................................... 15

## Statutes & Regulations

5 U.S.C. § 553 (2012)............................................................................................ 32

5 U.S.C. § 706(2)(A) (2012) ................................................................................. 15

19 C.F.R. § 159.1 (2013)......................................................................................... 9

19 C.F.R. § 351.107.......................................................................................*passim*

19 C.F.R. § 351.202 (b)(7)(C) (2013) .................................................................. 20

19 C.F.R. § 351.212 (2013)..................................................................................... 9

19 C.F.R. § 351.408 (2013)................................................................................... 20

19 U.S.C. § 1673e(a)(3) (2012) .................................................................. 9

19 U.S.C. § 1675 (2012) ................................................................... 9, 21

19 U.S.C. § 1677 (2012) .................................................................. 19, 20

19 U.S.C. § 1677b (2012) ...................................................................... 20

28 U.S.C. § 1295(a)(5) (2012) ............................................................... 2

28 U.S.C. § 1581(i) (2011) ............................................................ 1, 2, 15

28 U.S.C. § 2640(e) (2010) ................................................................... 15

**Administrative Materials**

*Antidumping and Countervailing Duty Proceedings, Assessment of
Antidumping Duties*, 68 Fed. Reg. 23,954 (May 6, 2003) .................................. 30

*Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27,296
(Dep't of Commerce May 19, 1997) ....................................................... 22, 24, 25

*Certain Cased Pencils from the People's Republic of China*
("*Cased Pencils from China*"), 59 Fed. Reg. 66,909 (Dec. 28, 1994) ........... 5, 28

*Certain Cased Pencils from the People's Republic of China*,
76 Fed. Reg. 2337 (Dep't Commerce Jan. 13, 2011) .......................................... 6

*Certain Cased Pencils from the People's Republic of China*,
76 Fed. Reg. 27,988 (Dep't Commerce May 13, 2011) (final admin.
review) ....................................................................................... 6, 7

*Initiation of Antidumping and Countervailing Duty Administrative Reviews,
Request for Revocation in Part, and Deferral of Initiation of
Administrative Review*, 75 Fed. Reg. 4770 (Dep't Commerce Jan. 29,
2010) ........................................................................................ 6

*Non-Market Economy Antidumping Proceedings: Assessment of
Antidumping Duties*, 76 Fed. Reg. 65,694 (Dep't of Commerce Oct. 24,
2011) ....................................................................................... 29

## STATEMENT OF RELATED CASES

The U.S. Court of International Trade ("CIT") issued an earlier decision in this case, *Michaels Stores, Inc. v. United States*, No. 12-00146, 2012 WL 6720675 (Ct. Int'l Trade Dec. 27, 2012) ("*Michaels I*"), in which the CIT denied the United States' motion to dismiss.  Furthermore, while this case challenges the U.S. Department of Commerce's ("Commerce") instructions, two parallel cases, challenging the ministerial implementation of those instructions, have been filed under 28 U.S.C. § 1581(a) (2012).  *Michaels Stores, Inc. v. United States*, Ct. No. 11-00137 (Ct. Int'l Trade filed Aug. 18, 2011);[1] *Michaels Stores, Inc. v. United States*, Ct. No. 12-00145 (Ct. Int'l Trade filed May 23, 2012).  These related case address the protests filed by Michaels Stores, Inc. ("Michaels") relating to the appropriateness of U.S. Customs and Border Protection's ("CBP") actions in implementing Commerce's instructions.  These actions are still pending.

## JURISDICTIONAL STATEMENT

The CIT properly took jurisdiction over this case under 28 U.S.C. § 1581(i)(4) (2011) as it involves a challenge of Commerce's liquidation instructions to CBP, which, in turn, rely on the cash deposit rates in effect at the time of entry.[2]

---

[1] This action relates to entries during a prior time period (Dec. 2006 – Nov. 2008) than is covered in this appeal (Dec. 2008 – Nov. 2010).

[2] The Court, in its denial of Defendant's Partial Motion to Dismiss, recognized that this case appropriately challenges the lawfulness of Commerce's liquidation

Continued on next page

1

This Court has recognized that challenges to Commerce's liquidation instructions are properly addressed under 28 U.S.C. § 1581(i)(4). *Consolidated Bearings Co. v. United States*, 348 F.3d 997, 1002-03 (Fed. Cir. 2003); *Shinyei Corp. of Am. v. United States*, 355 F.3d 1297, 1312 (Fed. Cir. 2004).

This is an appeal from a final decision, *Michaels Stores, Inv. v. United States*, Slip Op. 13-110, No. 12-00146 (Ct. Int'l Trade Aug. 21, 2013) (*"Michaels II"*). This appeal was timely filed on October 17, 2013. The Court of Appeals for the Federal Circuit ("CAFC") has jurisdiction over this case pursuant to 28 U.S.C. § 1295(a)(5) (2012).[3]

## STATEMENT OF THE ISSUE

The issue in this case is whether Commerce's liquidation instructions were contrary to law when they instructed CBP to liquidate entries not subject to an administrative review at a rate at variance with the deposit rate (producer's rate) called for by Commerce regulations (19 C.F.R. § 351.107(b)(2) (2013)). In doing so, Commerce asserted that the regulation was inapplicable to nonmarket economy

---

instructions, rather than CBP's actions: "However Commerce arrived at the instructions that were issued, it is Commerce that issued them, not Customs, the recipient. Thus, plaintiff's challenge is to Commerce's action in enforcing and administering the trade laws." *Michaels I*, 2012 WL 6720675 at *1.

[3] This brief is timely filed pursuant to an extension granted by this Court on December 12, 2013.

**CONFIDENTIAL MATERIAL SUBJECT TO A PROTECTIVE ORDER
HAS BEEN DELETED FROM THIS PAGE.**

("NME") antidumping cases despite the lack of any such exception in the clear

language of the regulation.

## STATEMENT OF THE CASE

Plaintiff-Appellant Michaels challenges a CIT opinion upholding

Commerce's liquidation instructions applicable to its imports of cased pencils from

the People's Republic of China ("PRC") which are subject to an antidumping duty

order.  Those liquidation instructions are, in turn, dependent on the cash deposit

rate in effect at the time of entry of the merchandise.

The issue in this case is a straightforward interpretation of a Commerce

regulation, 19 C.F.R. § 351.107(b)(2).  That regulation provides that where

merchandise is exported by a company that is not the producer of the merchandise

and Commerce has not established a combination (producer/exporter) or

noncombination (exporter specific) rate for the exporter in question, Commerce

will apply the cash deposit rate for the producer.

Michaels, relying on the plain language of that regulation, deposited

estimated antidumping duties based on the separate rates applicable to the

identified producers   [                                                      ].  A166-

169.[4]  Commerce, however, ignoring the clear language of the regulation, took the

---

[4] "A___" refers to the Joint Appendix in this appeal.

**CONFIDENTIAL MATERIAL SUBJECT TO A PROTECTIVE ORDER
HAS BEEN DELETED FROM THIS PAGE.**

position that this regulation did not apply to antidumping cases involving NME

countries, such as the PRC, and applied the PRC-wide rate of 114.90 percent

instead.

In upholding Commerce's position, the CIT not only accepted Commerce's

argument that there was an implied exception in the regulation for NME cases

based on Preamble language and an unrelated subsection of the regulation, but also

took the position that Commerce's NME (PRC)-wide rate is a "noncombination"

rate within the meaning of that regulation even though Commerce has given these

terms distinct meanings.

Commerce's unlawful interpretation resulted in a significant increase in

Michaels' antidumping liability and unfairly penalized Michaels, which relied on

the plain language of the regulation.

## STATEMENT OF FACTS

Michaels is an arts and crafts specialty retailer.  Michaels purchases and

imports certain cased pencils from China that are subject to antidumping duties

(subject cased pencils).  [

].  A162.

**CONFIDENTIAL MATERIAL SUBJECT TO A PROTECTIVE ORDER
HAS BEEN DELETED FROM THIS PAGE.**

At issue in this case is Michaels liability for dumping duties under an antidumping duty order on *Certain Cased Pencils from the People's Republic of China* ("*Cased Pencils from China*"), 59 Fed. Reg. 66,909 (Dec. 28, 1994), during two time periods: December 1, 2008-November 30, 2009 and December 1, 2009-November 30, 2010. During these review periods, Michaels reported the producer of the cased pencils to CBP, and deposited the estimated antidumping duties based on the separate rate applicable to the identified producer.

[

]. A162-163.

Michaels forwarded the name of the pencil producer to its customs broker, who entered the cased pencils under the applicable antidumping duty case number and cash deposit rate for the producer of the pencils, since none of the applicable exporters had a separate deposit rate in its own name.

## I.    2008-2009 Period of Review

During the 2008-2009 review period, Michaels purchased pencils which, according to information provided by the Chinese vendor, were produced by China First Pencil Company ("China First"), Shanghai Three Star Stationary Co. Ltd.

**CONFIDENTIAL MATERIAL SUBJECT TO A PROTECTIVE ORDER
HAS BEEN DELETED FROM THIS PAGE.**

("Three Star"), or Shangong Rongxin Import and Export Co. Ltd. ("Rongxin").

A163.  Michaels received these pencils from three different PRC exporters: [

].  A163.

Commerce initiated administrative reviews of China First, Three Star, and

Rongxin for this period;[5] however, China First and Three Star withdrew their

requests for review.[6]  Commerce completed a review for Rongxin and determined

a 0.17 percent margin. *Certain Cased Pencils from the People's Republic of China*,

76 Fed. Reg. 27,988 (Dep't Commerce May 13, 2011) (final admin. review)

("2008-2009 AR Results"). [

].  A163-164.  [

].  *Id.*

_____

[5] On January 29, 2010, Commerce published a notice of initiation of an
administrative review of the Order for the 2008-2009 period. *Initiation of
Antidumping and Countervailing Duty Administrative Reviews, Request for
Revocation in Part, and Deferral of Initiation of Administrative Review*, 75 Fed.
Reg. 4770, 4772 (Dep't Commerce Jan. 29, 2010).  This notice of initiation
included China First, Three Star, and Rongxin among the firms to be reviewed.

[6] *See Certain Cased Pencils from the People's Republic of China*, 76 Fed. Reg.
2337, 2338 (Dep't Commerce Jan. 13, 2011) (prelim. results and partial recision).
In the same notice, Commerce also rescinded the reviews of China First and Three
Star. *Id.*

The applicable liquidation instructions for China First and Three Star applied to entries from "firms" whose names were identified in the message and instructed CBP to "assess antidumping duties on this merchandise entered, or withdrawn from warehouse, for consumption during the 12/01/2008 through 11/30/2009 at the cash-deposit or bonding rate in effect at the time of entry" and instructed CBP to "liquidate all entries *for the following firms*" – the list of firms specifically identified China First and Three Star.  A138 (emphasis added).

Following the 2008-2009 administrative review of Rongxin, Commerce issued a new rate for Rongxin of 0.17 percent.  2008-2009 AR Results, 76 Fed. Reg. at 27,989.  Commerce also issued confidential "exporter/importer-specific" liquidation instructions for Rongxin without including Michaels on the importer list.[7]  The liquidation instructions further stated that for all shipments of cased pencils exported by Rongxin not covered by the importer-specific rates, dumping duties were to be assessed at the cash deposit rate in effect at the date of entry. A154-156.  A subsequent liquidation notice directed CBP to "assess antidumping duties on merchandise entered, or withdrawn from warehouse, for consumption *for*

---

[7] A154-156.  The instructions state, "{f}or all shipments of certain cased pencils from the People's Republic of China exported by Shandong Rongxin Import and Export Co., Ltd…imported by, or sold to, the importer or customer…listed below…assess an antidumping liability equal  to the per-unit dollar amount for each unit of subject merchandise listed below."  A154.

**CONFIDENTIAL MATERIAL SUBJECT TO A PROTECTIVE ORDER
HAS BEEN DELETED FROM THIS PAGE.**

*the PRC-wide entity at the cash-deposit or bonding rate in effect at the time of*

*entry*." A159 (emphasis added). Commerce issued no instructions directing the

assessment of antidumping duties on merchandise produced by a company with a

separately assigned rate but exported by another company without a separate rate.

II.    **2009-2010 Period of Review**

During the 2009-2010 review period, Michaels purchased pencils which,

according to information provided by the Chinese vendor, were produced by China

First and Rongxin. A164. Michaels received these pencils from [

]. *Id.*

While Commerce initiated administrative reviews for Rongxin and Beijing

Fila Dixon Stationery Company, Ltd., both of these reviews were subsequently

withdrawn. The applicable liquidation instructions for China First and for Rongxin

applied to entries from "firms" whose names were identified in the message and

instructed CBP to "assess antidumping duties on their merchandise entered, or

withdrawn from warehouse, for consumption during the period 12/01/2009 through

11/30/2010 *at the cash deposit or bonding rate in effect at the time of entry*."

A142-143; A150 (emphasis added).

III.   **Commerce's Automatic Assessment System Makes Liquidation Rates
       Dependent on Deposit Rates**

The liquidation rates at issue here are dependent on the deposit rates because

there were no administrative reviews of the applicable entries. The United States

operates a retrospective system of antidumping duties, where the final dumping margin is not calculated until after the subject merchandise has already been imported. 19 C.F.R. § 351.212(a) (2013). When an importer enters goods covered by an antidumping order, the importer generally must make a cash deposit of estimated antidumping duties. 19 U.S.C. § 1673e(a)(3) (2012). The final amount owed by the importer is not fixed, however, until the entry is liquidated. Liquidation means the final computation or ascertainment of the duties. 19 C.F.R. § 159.1 (2013). The final amount may vary from the amount deposited because an interested party may request an administrative review of Commerce's antidumping order before liquidation occurs. 19 U.S.C. § 1675 (2012).

If an annual administrative review is not requested for a particular company, or if an administrative review is requested and initiated, but subsequently rescinded, entries of that company's subject merchandise are assessed duties at the rate of deposit "required on that merchandise at the time of entry." 19 C.F.R. § 351.212(a) & (c)(1)(i);[8] *see also Federal-Mogul Corp. v. United States*, 822 F.

---

[8] Commerce regulation 351.212(c)(1)(i) governs the assessment of duties and provides:

(c) Automatic assessment of antidumping and countervailing duties if no review is requested:

(1) If the Secretary does not receive a timely request for an administrative review of an order ... the Secretary, without additional notice, will instruct the Customs Service to

Continued on next page

Supp. 782, 787-88 (Ct. Int'l Trade 1993) ("{T}he statutory framework for administrative reviews clearly anticipates that in cases where a company makes cash deposits on entries of merchandise subject to antidumping duties, and no administrative review of those entries is requested, the cash deposit rate automatically becomes that company's assessment rate for those entries.").

## IV.    Cash Deposit Rates

As discussed above, Commerce's liquidation instructions directed CBP to assess duties for these "firms" (not specifying whether the "firms" were exporters or producers) at the cash deposit rate "in effect at time of entry."  Thus, the liquidation instructions related back to Commerce's previously-issued cash deposit instructions.  Because the liquidation instructions refer to the cash deposit instructions, the legality of the cash deposit instructions determines the legality of the liquidation instructions.

Cash deposit rates for nonproducing exporters are provided for in Commerce regulation 19 C.F.R. § 351.107(b)(2).  That regulation provides:

---

(i) Assess antidumping duties or countervailing duties, as the case may be, on the subject merchandise described in 351.213(e) at rates equal to the cash deposit of, or bond for, estimated antidumping duties or countervailing duties required on that merchandise at the time of entry, or withdrawal from warehouse, for consumption; and

(ii)To continue to collect the cash deposits previously ordered.  19 C.F.R. 351.212(c)(1).

*New Supplier.* In the case of subject merchandise that is exported to the United States by a company that is not the producer of the merchandise, *if the Secretary has not established previously a combination cash deposit rate under paragraph (b)(1)(i) of this section for the exporter and producer in question or a noncombination rate for the exporter in question, the Secretary will apply the cash deposit rate established for the producer.* If the Secretary has not previously established a cash deposit rate for the producer, the Secretary will apply the "all-others rate" described in section 705(c)(5) or section 735(c)(5) of the Act, as the case may be. (emphasis added).

This regulation establishes the producer rate as the default cash deposit rate. If the producer rate is known and there is neither a combination producer/exporter rate nor an exporter specific rate, Commerce is to apply the producer-specific rate. There are no combination or noncombination exporter rates in this case, but the producers had separate rates and were identified at time of entry. Thus, in accordance with 19 C.F.R. § 351.107(b)(2), the cash deposit rate should have been the producer rates.

Instead, contrary to 19 C.F.R. § 351.107(b), Commerce's cash deposit instructions in this case stated:

If any entries of this merchandise are exported by a firm other than the exporters[9] listed above, then the following instructions apply:

---

[9] Prior to the periods of review involved in this case, Commerce had issued a series of cash deposit instructions specifying that the cash deposit rates had been revised
Continued on next page

11

**CONFIDENTIAL MATERIAL SUBJECT TO A PROTECTIVE ORDER
HAS BEEN DELETED FROM THIS PAGE.**

A.    If the PRC or non-PRC exporter of the subject merchandise has its
own rate, use the applicable exporter's rate for determining the cash
deposit rate.

B.    **For all PRC exporters of subject merchandise which have not
been assigned a separate rate, the cash deposit rate will be the
PRC-wide rate of 114.90 percent.**

C.    For all non-PRC exporters of subject merchandise which have not
received their own rate, the cash deposit rate will be the rate
applicable to the PRC exporter that supplied that non-PRC exporter.

A83; A123 (emphasis added).  Thus, while Commerce's cash deposit regulation

provides that exporters without separate rates will be assigned the cash deposit rate

of the *producer*, Commerce's cash deposit instructions in this case ignored the

producer rates and provided that PRC exporters without a separate rate will be

assigned the PRC-wide rate of 114.90.

**V.    Liquidation at 114.90 Percent PRC-Wide Rate as Opposed to Producer
Rate**

[

---

for "manufacturers/exporters," s*ee e.g.*, A70; A72; A74, while the cash deposit
instructions at issue in this case state only "exporter."  *See e.g.*, A82; A122.

**CONFIDENTIAL MATERIAL SUBJECT TO A PROTECTIVE ORDER
HAS BEEN DELETED FROM THIS PAGE.**

]. A164. [



]. *Id.*

Between August 12, 2011, and November 4, 2011, CBP officials at the

relevant ports issued bills to Michaels seeking the difference between the cash

deposits Michaels made at the producer's rates (China First, Three Star, and

Rongxin) and liquidation at the PRC-wide 114.90 percent *ad valorem* rate for the

December 1, 2008, through November 30, 2009, review period.  A164.  Similarly,

between July 1, 2011, and November 4, 2011, CBP officials at the relevant ports

issued bills to Michaels for supplemental duties, requiring liquidation of Michaels'

entries of pencils manufactured by China First and Rongxin made between

December 1, 2009, and November 30, 2010, at the PRC-wide rate of 114.90

percent *ad valorem*.  A165.  These CBP notices were based on Commerce's

erroneous cash deposit and liquidation instructions.

As a result of this error, Commerce ordered liquidation of Michaels' entries

at the PRC-wide rate of 114.90 percent *ad valorem*, instead of the cash deposit

rates posted for the relevant entries (China First 26.32 and 10.41 percent; Three

Star 2.66 percent; and Rongxin 11.48 and 3.55 percent).  A164-165.

## SUMMARY OF ARGUMENT

Michaels appeals the CIT decision upholding Commerce's liquidation instructions that directed CBP to assess antidumping duties based on the identity of the exporters as opposed to the identity of the known manufacturer or producer as required by 19 C.F.R. § 351.107(b).  In reaching this position, the CIT and Commerce ignored the plain language of the regulation and instead took the position that this regulation, 19 C.F.R. § 351.107(b)(2), does not apply to a NME dumping case.  Commerce's position, as sustained by the CIT, is not in accordance with law because it:  1) ignores the plain language of the regulation which applies to all dumping cases without exception; and 2) is inappropriately based on an out-of-context statement in the Preamble to the regulation, and on general NME policy considerations – neither of which override the plain language of the regulation.  In addition, the CIT takes the position that the term "noncombination rates" in the regulation is equivalent to PRC-wide rates, even though Commerce has consistently given those terms separate meanings.

Even if this Court accepts Commerce's policy arguments that it is appropriate to establish cash deposit rates in NME cases differently from market economy cases, the plain language of the applicable regulation does *not* make that distinction.  Commerce must follow the requirements in the Administrative Procedures Act ("APA") if it wishes to change its regulations.  It is precluded from

changing regulations through policy pronouncements or administrative practice. Furthermore, importers such as Michaels are entitled to rely on the clear language of the regulations, and Commerce's failure to abide by these regulations unfairly penalizes Michaels.

Commerce's liquidation instructions with regard to China First, Rongxin, and Three Star, which referred to cash deposit instructions that were inconsistent with the applicable regulations, were contrary to law because, read together, they directed CBP to assess antidumping duties on the merchandise at issue at the incorrect rate, in conflict with the requirements of 19 C.F.R. § 351.107(b)(2).

## STANDARD OF REVIEW

In reviewing the CIT's decision, the CAFC applies the same standard used by that court in evaluating Commerce's determinations, findings, and conclusions. *Eurodif, S.A. v. United States*, 411 F. 3d 1355, 1359 (Fed. Cir. 2005). The court will find unlawful an action by Commerce if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (2012); *see* 28 U.S.C. § 2640(e) (2010) (directing the court to evaluate 28 U.S.C. § 1581(i) cases under the standards set forth in the APA).

In assessing whether Commerce's determination is in accordance with law, the Court should look first to the plain meaning of the relevant statutes and regulations. *See Zerilli v. Evening News Ass'n*, 628 F.2d 217, 220 (D.C. Cir. 1980)

(citing *Caminetti v. United States*, 242 U.S. 470, 485 (1917)).  Where the words of

a statute or regulation are unambiguous, the "judicial inquiry is complete."  *Desert*

*Palace, Inc. v. Costa*, 539 U.S. 90, 98 (2003).

To determine whether the CIT correctly applied that standard in reaching its

decision, this court must apply the statute's express standard of review to the

agency's determination.  *Atlantic Sugar, Ltd. v. United States*, 744 F. 2d 1556,

1559 (Fed. Cir. 1984).

## ARGUMENT

## I.    Commerce Did Not Comply with the Provisions of 19 C.F.R. § 351.107(b)(2)

In accordance with 19 C.F.R. § 351.107(b)(2), all subject merchandise

imported by Michaels should have been liquidated at the deposit rate for the

producers because the exporters on those transactions did not have a separate rate

assigned by Commerce.  In particular, 19 C.F.R. § 351.107(b)(2) provides,

> *{I}f the Secretary has not established previously a combination cash deposit rate under paragraph (b)(1)(i) of this section for the exporter and producer in question or a noncombination rate for the exporter in question, the Secretary will apply the cash deposit rate established for the producer.*  If the Secretary has not previously established a cash deposit rate for the producer, the Secretary will apply the "all-others rate" described in section 705(c)(5) or section 735(c)(5) of the Act, as the case may be.  (emphasis added).

Based on this regulation, entries of merchandise not subject to review (entries of

merchandise produced by China First (in 2008-2010), Rongxin (2009-2010), and

**CONFIDENTIAL MATERIAL SUBJECT TO A PROTECTIVE ORDER
HAS BEEN DELETED FROM THIS PAGE.**

Three Star (2008-2009)) should have been liquidated at the cash deposit rate

applicable at the time of entry, which was the assigned rate for the producer.[10]

Similarly, Commerce's liquidation of Michaels' 2008-2009 entries produced by

Rongxin should have also been liquidated at the assigned rate for Rongxin on the

date of entry because, although Commerce conducted an administrative review of

Rongxin in 2008-2009, [

].

Commerce's cash deposit instructions in this case required that the cash

deposit rate for the exporter, as opposed to the producer, be applied at the time of

entry. Because China First, Rongxin, and Three Star were not the seller/exporter,

CBP applied the PRC-wide rate at liquidation. However, the correct cash deposit

rate in effect at the time of entry was the separate rate for the producer. Thus, the

liquidation instructions were not in accordance with law because they related back

to unlawful cash deposit instructions and failed to correct the original error.

Accordingly, Commerce's liquidation instructions were contrary to law

because they directed CBP to collect duties based on the identity of the "exporter"

---

[10] During the relevant time periods, the only review to which any of these
companies were subject was the 2008-2009 review, in which Rongxin was
reviewed. China First and Three Star were subject to an administrative review
request for the 2008-2009 review period, but that review was rescinded when the
review requests were withdrawn.

(a term not defined in the instructions), which was contrary to Commerce's

regulation, 19 C.F.R. § 351.107(b)(2), which directs that the duty deposit rate

should be based on the identity of the producer, if known at the time of entry.

As discussed below, Commerce issued unlawful liquidation instructions and

related cash deposit instructions with regard to all merchandise imported by

Michaels that was produced by these companies during this two year period.

## II.    19 C.F.R. § 351.107(b)(2) Unambiguously Applies to All Antidumping Determinations, Including NME Determinations

This Court must set aside Commerce's interpretation if it was "plainly

erroneous or inconsistent with the regulation." *Bowles v. Seminole Rock & Sand

Co.*, 325 U.S. 410, 414 (1945). A court owes no deference to Commerce's

interpretation of its unambiguous regulation. *Christensen v. Harris County*, 529

U.S. 576, 588 (2000) ("To defer to the agency's position would be to permit the

agency, under the guise of interpreting a regulation, to create *de facto* a new

regulation."). Where the words of a statute or regulation are unambiguous, the

"judicial inquiry is complete." *Desert Palace*, 539 U.S. at 98 (quoting *Rubin v.

United States*, 449 U.S. 424, 430 (1981)); *see also American Airlines, Inc. v.

United States*, 551 F.3d 1294, 1300 (Fed. Cir. 2008); *Viraj Group v. United States*,

476 F.3d 1349, 1355 (Fed. Cir. 2007) ("If a regulation is clear on its face, no

deference is given to the promulgating agency's interpretation, as {the reviewing court} interpret{s} the regulation in accordance with its clear meaning.").

In upholding Commerce's position, the CIT took the position that 19 C.F.R. § 351.107(b)(2) provides the appropriate cash deposit rates in the Market Economy context, but does not apply in an NME context. *Michaels II* at 13. The CIT justified this distinction not on any specific regulatory language but merely on the assertion that "NMEs are treated differently because Commerce applies a presumption of state control in NME countries over both producers and exporters." *Michaels II* at 13.

Commerce's implied NME exception is contrary to law as the applicable regulation is clear on its face and unambiguously provides for no exception. Section 351.107(b)(2) applies in the "case of subject merchandise that is exported to the United States by a company that is not the producer of the merchandise." "Subject merchandise" is defined in turn as "the class or kind of merchandise that is within the scope of an investigation, a review…" and this term includes both market and NME proceedings. 19 U.S.C. § 1677(25) (2012). Thus, by its terms, the regulation applies to all antidumping determinations – there is no exception for NME cases.

The CIT and Commerce attempted to justify their position based on Commerce's special rules for calculating antidumping duty margins in cases

involving NMEs, such as the PRC. *See* 19 U.S.C. § 1677b(c) (2012). Specifically, in proceedings involving NME countries, the Department begins with a rebuttable presumption that all companies within the country are essentially operating units of a single, government-wide entity and, thus, should receive a single antidumping duty rate (i.e., an NME-wide rate). Exporters must pass a separate rate test to receive a rate that is separate from the NME rate. Those exporters that do not or cannot demonstrate that they are separate from the government-wide entity receive the NME-wide rate. The three companies at issue here, China First, Three Star, and Rongxin, all passed this separate rate test establishing their independence from the government-wide entity.

Where Commerce's special NME rules apply, the relevant statute and regulations specifically provide for those special rules.[11] Here, by contrast, there is nothing in the regulation indicated that § 351.107(b)(2) is limited to market economy cases nor are there any separate provisions that set forth cash deposit rates in NME cases.

---

[11] *See, e.g.*, 19 U.S.C. § 1677(18) (definition of NME and determination of NME status); 19 U.S.C. § 1677b(c) (special rules for calculating normal value in NME cases); 19 C.F.R. § 351.202 (b)(7)(C) (2013) (special rule for contents of petition in NME case); and 19 C.F.R. § 351.408 (2013) (calculation of normal value of merchandise from nonmarket economy countries).

The statute does not make any distinction between assessment rates for market economies and NMEs, so there is no basis to contend that the regulation implementing these provisions should make that distinction. *See* 19 U.S.C. § 1675. For example, the calculation of the "all others rate" deposit rate in investigations has been deemed applicable to market and NME provisions alike. *See Amanda Foods (Viet.) Ltd. v. United States*, 647 F. Supp. 2d 1368, 1379-1380 (Ct. Int'l Trade 2009) (applying the all others rate provision (19 U.S.C. § 1673d(c)(5)) to an NME dumping case).

Also, contrary to the contentions of the CIT and Commerce, § 351.107(d) does not provide an exception to § 351.107(b)(2). Section 351.107(d) provides as follows:

> *Rates in antidumping proceedings involving nonmarket economy countries*. In an antidumping proceeding involving imports from a nonmarket economy country, "rates" may consist of a single dumping margin applicable to all exporters and producers.

This provision merely provides support for the concept of what Commerce today refers to as a "countrywide" rate. But it says nothing more than this. Nothing in this provision explicitly or implicitly modifies the cash deposit rate provisions in § 351.107(b).

This interpretation is reinforced by the regulatory history of § 351.107(d). This provision was originally included in the definitional section (§ 351.102(b)) in

the proposed regulations, but was moved to § 351.107 in the final regulations.[12]

There was no counterpart to § 351.107(b) in the proposed regulations.[13]  Thus,

these are independent provisions and there is no basis for determining that §

351.107(d) modifies § 351.107(b).

Because 19 C.F.R. § 351.107(b) unambiguously applies to all antidumping

cases, Commerce's position that it is not applicable in an NME context was clearly

contrary to law and is entitled to no deference.

## III.   The Preamble to 19 C.F.R. § 351.107(b)(2) Does Not Modify the Regulation

Commerce and the CIT further erred in relying on Preamble language to 19

C.F.R. § 351.107(b)(2) to support the position that the regulation is inapplicable to

NME cases.  Although regulatory history contained in a regulation's Preamble can

help interpret an ambiguous provision, it never trumps the plain meaning of the

---

[12] *Antidumping Duties; Countervailing Duties*, 62 Fed. Reg. 27,296, 27,304 (Dep't of Commerce May 19, 1997) ("Preamble") (stating that "the second sentence of the definition of "rates" in proposed § 351.102(b) provided the Department with the authority to apply a single AD margin to all producers and exporters from a nonmarket economy ("NME") country.  We have moved that sentence to paragraph (d) of 351.107.  As explained in the AD Proposed Regulations, 61 FR at 7311, the Department elected not to codify its current presumption that a single rate will be applied in NME cases").

[13] *Id*. at 27,303 (stating that in the AD proposed regulations, 61 FR at 7311, the Department requested additional public comment on the issue of whether to promulgate special rules regarding the rates applicable to exporters that are not also producers, such as trading companies).

actual regulation. *See Roberto v. Dep't of Navy*, 440 F.3d 1341, 1350 (Fed. Cir. 2006) (finding that "{b}ecause the plain meaning of the regulation is clear, no further inquiry is required into agency interpretations or the regulatory history to determine its meaning"). Since, as discussed, the language of the regulation is clear, the Preamble language cannot modify the plain language.

Even if the Preamble conflicted with the language of § 351.107(b)(2), which it does not, the Preamble should not be accorded equal weight to the text of a regulation: "The Preamble is not part of the governing regulations set forth in the C.F.R. Rather it is described by Commerce as 'supplementary information,' published contemporaneously with the regulations." *Tung Mung Dev. Co., Ltd. v. United States*, 25 C.I.T. 752, at \*8 n. 21 (2001). The Preamble "is a policy statement, and not an agency interpretation that holds the 'force of law.'" *Id.* at \*13.

In addition, Commerce and the CIT misconstrued the Preamble language cited. The CIT stated: "Pointing to this presumption of state control, Commerce rejected the idea that it should assign cash deposit rates to entries based on the identity of the producer of the merchandise as opposed to the identity of the nonproducing exporter." *Michaels II* at 13. However, the full quote relied on does not support this position. The full quote is as follows:

> Another instance in which the Department assigns rates to exporters is in AD investigations and reviews of imports from nonmarket economies (NMEs). In those cases, *if sales to the United States are made through an NME trading company*, we assign a noncombination rate to the trading company regardless of whether the NME producer supplying the trading company has knowledge of the destination of the merchandise…Where exclusions are involved, we publish a combination rate to address the same concerns described above regarding redirection of exports through an excluded trading company. Nothing in § 351.107(b)(1) is intended to change our policy for assigning rates in NME proceedings.

Preamble at 27,303 (emphasis added). The Court inappropriately equated Commerce's treatment of "non-producing exporters" with Commerce's treatment of "trading companies." The quote only indicates Commerce's policy with respect to sales through NME trading companies; it does not provide any indication of Commerce's policy with respect to other "non-producing exporters."

It is clear from other parts of the Preamble that there is a distinction between trading companies and non-producing exporters. Specifically, at an earlier part of the Preamble to the regulations, the Department stated:

> On the other hand, the Department believes that there are situations where it may be inappropriate and/or impractical to establish combination rates. For example, it may not be necessary to establish combination rates when investigating or reviewing *nonproducing exporters that are not trading companies*, such as original equipment manufacturers.

*Id.* (emphasis added). The quoted language simply confirms that while Commerce retains the general discretion to calculate multiple combination rates for exporters that purchase from multiple producers, it will not calculate multiple combination rates for NME trading companies. Rather, Commerce will calculate only a single rate applicable to all such combinations.

Thus, the clear text of Commerce's regulations must prevail over the supplementary interpretative aid of the Preamble. Commerce's interpretation cannot be sustained on this basis.

## IV.    The CIT's Position that the PRC-Wide Rate Serves as a Noncombination Rate Is Not Supported by Law

The CIT based its justification for upholding Commerce's interpretation on an interpretation not advanced by either of the parties to this case.[14] In particular, in an apparent attempt to squeeze Commerce's interpretation into the language of the applicable regulation, the CIT asserted that the PRC-wide rate "serves as a noncombination rate for these nonproducing exporters because § 351.107(d) of the regulation sheds light on the meaning of 351.107(b)(2)." *Michaels II* at 15. Essentially, the CIT took the position that "noncombination rate" means the same

---

[14] After asserting that "this is the central dispute between the parties," the CIT acknowledged that the issue is not clearly argued in the briefs." *Michaels II* at 11, n. 14.

thing as a "PRC-wide rate." However, these terms have entirely different
meanings.

The CIT attempted to justify its position based on Commerce's policy of
treating non-separate NME companies as a single entity, unless they prove that
they are not under state control. In particular, the CIT asserted that because the
subject exporters did not seek separate rates, they are reviewed as part of the
collective PRC-entity and assigned the PRC-wide rate, not a separate rate or a
separate combination exporter/producer rate. *Michaels II* at 11 (citations omitted).

The CIT concluded that:

{A}lthough all of the producers of cased pencils imported by Michaels
during the PORs in question were individually investigated and assigned
their own rates, those rates are irrelevant to the exporters' rates because the
regulation calls for the rates of the exporters to be used, if such exist, prior to
looking at the producers' rates. 19 C.F.R. § 351.107(b)(2). Here, the PRC-
wide rate serves as a noncombination rate for these nonproducing exporters
because § 351.107(d) of the regulation sheds light on the meaning of §
351.107(b)(2). The regulation indicates that for an AD proceeding involving
an NME, such as the PRC in the present case, the term "rate" can be read to
include the possibility of a single rate for exporters, producers, or both. See
19 C.F.R. § 351.107(b)(2). This "single rate" here is the PRC-wide rate.

*Michaels II* at 14-15. There is no basis, however, to equate a noncombination rate
to the PRC-wide rate. The regulation defines "combination rate" as the "cash
deposit rate for each combination of the exporter and its supplying producer{s}."
19 C.F.R. § 351.107(b)(1)(i). Noncombination rate simply means a calculated rate

specific to one entity. By contrast, the NME-wide rate (in this case, the PRC-wide rate) is applied to entities that have not established their entitlement to a separate rate from the NME-wide entity. Thus, the CIT inappropriately took the position that a rate that is specific to a particular entity (noncombination rate) means the same thing as a rate that applies country wide and is *not specific* to any entity (PRC or NME-wide rate). The only textual justification provided for this position was that "§ 351.107(d) of the regulation *sheds light* on the meaning of § 351.107(b)(2)." *Michaels II* at 15 (emphasis added). This justification is basically an acknowledgment that § 351.107(b)(2) does not directly apply.

Thus, the CIT's argument that noncombination rates and PRC rates are the same is clearly unsupported by law.

## V.    Even if the Regulation Were Ambiguous, Commerce's Interpretation Deserves No Deference Because Commerce Has Not Consistently Applied the Regulation

Furthermore, this Court need not defer to Commerce's interpretation because Commerce has not consistently applied the regulation. *See Decker v. Nw. Envtl. Def. Ctr.*, 133 S. Ct. 1326, 1329-30 (2012) (stating that deference is appropriate when "there is no indication that {an} agency's current view is a change from prior practice" or where "{an agency} has been consistent in its view"). As the Supreme Court explained in *Christopher v. SmithKline Beecham Corp.*, "To defer to the agency's interpretation in this circumstance would

seriously undermine the principle that agencies should provide regulated parties

'fair warning of the conduct {a regulation} prohibits or requires.'"  132 S. Ct.

2156, 2167 (2012) (citing *Gates & Fox Co., Inc. v. Occupational Safety and

Health Review Comm'n*, 790 F.2d 154, 156 (D.C. Cir. 1986)).  In this situation, it

is appropriate for the court to apply only "a measure of deference proportional to

the 'thoroughness evident in {the agency's} consideration, the validity of its

reasoning, its consistency with earlier and later pronouncements, and all those

factors which give it power to persuade.'"  *Christopher*, 132 S. Ct. at 2169 (citing

*United States v. Mead Corp.*, 533 U.S. 218, 228 (2001)).

Commerce failed to demonstrate a long-standing practice.  Commerce's cash

deposit instructions demonstrate that Commerce's practice shifted in 2011, long

after the entries in this case.  While Commerce previously issued cash deposit

instructions under the *Cased Pencils from China* order specifying that cash deposit

rates had been revised for specified "manufacturers/exporters," the cash deposit

instruction at issue in this case state only "exporters."[15]  Nor does the "practice"

articulated by Commerce comport with the CBP instructions in the record, as they

---

[15] *Compare* A70, A72, *and* A74 (which stated "manufacturers/exporters,") *with*
A77, A82, *and* A122 (which stated "exporters").

interchangeably use the terms "manufacturer," "exporter," and "firm." Commerce does not even have a clear definition of "exporter."[16]

Also, as the CIT has recognized in litigation relating to the 2007-2008 review period for *Cased Pencils from China*, even where Commerce referred to China First and Three Star as "exporters," they were operating as producers and the calculated "exporters" rates were in fact "producers" rates.[17]

---

[16] *See, e.g., Non-Market Economy Antidumping Proceedings: Assessment of Antidumping Duties*, 76 Fed. Reg. 65,694, 65,695 (Dep't of Commerce Oct. 24, 2011), stating:

> In response to the *Proposed Policy*, certain parties argued that the Department should clarify the term "exporter" for this refinement in practice to provide notice to the importers regarding which entity the importer should consider to be the exporter in a multi-leg transaction for the purpose of claiming the correct cash deposit rate and having the entry liquidated in accordance with that expectation. Because of the variances in commercial practice, it is the Department's established practice to evaluate an export transaction on a case-by-case basis within the context of an administrative review or investigation. Within the framework of an administrative review, the Department is able to examine additional documentation to decide which entity was the exporter for purposes of making NME AD determinations.

[17] The mandatory respondents – Three Star and China First – were producers and their sales were analyzed during the 2007-2008 period of review. *See Walgreen Co. v. United States*, Slip Op. 10-142, Ct. No. 10-00373, 2010 Ct. Int'l Trade LEXIS 145, at *1 (Ct. Int'l Trade Dec. 23, 2010); *Target Corp. v. United States*, Slip Op. 10-141, Ct. No. 10-00353, 2010 Ct. Int'l Trade LEXIS 146, at *2 (Ct. Int'l Trade Dec. 23, 2010).

Finally, Commerce cannot contend that it has a long-standing practice when it has issued two "clarifications" of its assessment policy rates.[18]  Notably, when Commerce issued a "clarification" of the automatic-liquidation regulations, Commerce stated that "{t}his clarification does not apply to imports of merchandise from non-market-economy (NME) countries which may be subject to an antidumping duty order."  New Assessment Policy at 23,961.  There would have been no reason to make this statement if the automatic liquidation provisions (§ 351.107(b)) were only applicable to market economy countries.

Thus, there has been a lack of consistency in Commerce's application of § 351.107(b)(2), and therefore Commerce's interpretation of this regulation is not entitled to deference.

## VI.    Upholding Commerce's Interpretation Amounts to Allowing the Agency to Amend its Regulations Without Following the APA Requirements

To uphold Commerce's interpretation would amount to improperly allowing the agency to amend its regulations without following the APA requirements.  As

---

[18] *See Antidumping and Countervailing Duty Proceedings, Assessment of Antidumping Duties*, 68 Fed. Reg. 23,954 (May 6, 2003) ("New Assessment Policy"); Import Administration Policy Bulletin, Number: 05:1, "Separate-Rates Practice and Application of Combination Rates in Antidumping Investigations Involving Non-Market Economy Countries" (Apr. 5, 2005).  Neither new interpretation is applicable to this case as the May 6, 2003, clarification indicates that it is not applicable to NMEs and the May 5, 2005, policy bulletin only applies to NME antidumping investigations initiated on or after the date of publication in the Federal Register of the notice and also applies only to investigations.

stated in *Exportal Ltda. v. United States*, "if permitted to adopt unforeseen interpretations, agencies could *constructively amend* their regulations while evading their duty to engage in {APA} notice and comment procedures." 902 F. 2d 45, 50 (D.C. Cir. 1990); *see also*, *Christensen v. Harris County*, 529 U.S. 576, 588 (2000) ("To defer to the agency's position would be to permit the agency, under the guise of interpreting a regulation, to create *de facto* a new regulation."). In a somewhat similar context, the CIT has held that Commerce's withdrawal of its targeted dumping regulation did not comply with the APA's notice and comment requirements, and therefore the repeal of the regulation was invalid and the regulation remained in force. *Gold East Paper (Jiangsu) Co., Ltd. v. United States*, Slip Op. 13-74, 2013 WL 2996231 (Ct. Int'l Trade June 17, 2013).

In upholding Commerce's interpretation of 19 C.F.R. § 351.107(b), the CIT improperly focused on policy arguments as opposed to textual ones. In doing so, the CIT overstepped its role. *See Pavelic & LeFlore v. Marvel Entm't Grp*, 493 U.S. 120, 126 (1989) ("Our task is to apply the text, not to improve upon it.").

Even if this Court accepts Commerce's policy arguments that it is appropriate to establish cash deposit rates in NME cases differently from market economy cases, the fact is that the applicable regulation does not make that distinction. The only appropriate method to achieve this result if for Commerce to issue a new or revised regulation, after following all of the notice and comment

procedures of the APA. By definition, such change could not apply retroactively to

the entries that are the subject of this litigation.  *See* 5 U.S.C. § 553 (2012).

## VII.  Commerce's Interpretation Would Be Unfair to Importers Such as Michaels Who Justifiably Relied on the Plain Language of the Regulation

Commerce's interpretation of the regulation would be unfair to Michaels, an

importer, who justifiably relied on the unambiguous regulation. *Ernst & Ernst v.*

*Hochfelder et al.*, 425 U.S. 185, 199 (1976) (favoring a statute's plain meaning

where the Commission's interpretation "would add a gloss to the operative

language of the statute quite different from its commonly accepted meaning")

(citing *Addison v. Holly Hill Fruit Products, Inc.*, 322 U.S. 607, 618 (1944)

("…legislation when not expressed in technical terms is addressed to the common

run of men and is therefore to be understood according to the sense of the thing, as

the ordinary man has a right to rely on ordinary words addressed to him.")).

Michaels had no reason to request an administrative review for its imports

from the three producers because the regulation was clear.  Michaels tendered cash

deposits at producer-specific rates, consistent with the regulations, and never had

reason to question that these rates might not be correct.  Michaels was also willing

to accept these rates as filed, and thus did not request an administrative review.  It

was not until after reviews were already requested and concluded that Michaels

learned from CBP that cash deposits were deemed insufficient.

Nor did Commerce's liquidation or cash deposit instructions provide

Michaels with adequate notice that it was taking a position at odds with the

regulations. The applicable liquidation instructions directed CBP to liquidate all

entries for the listed "firms" at the cash deposit or bonding rate in effect at the time

of entry. A138. Commerce's cash deposit instructions, in turn, referred to

individual "exporter" rates (A83; A123), but the term "exporter" is not defined in

either Commerce's statute or regulations, and Commerce has at times used the

terms producer and exporter interchangeably and inconsistently.[19] In any event,

since China First, Three Star, and Rongxin had all received separate rates from

Commerce, Michaels had no basis for concluding that merchandise attributed to

these entities would be assigned the PRC-wide rate, which is the rate for

companies without a separate rate.

This court has recognized the need to provide adequate notice to importers

that their antidumping liability may be affected. *See Transcom, Inc. v. United

States*, 182 F. 3d 876, 884 (1999). The CAFC agreed with importer Transcom that

Commerce did not provide adequate notice that the unnamed exporters' products

would be subject to the administrative reviews, stating:

---

[19] *See* Section V, noting Commerce's inconsistent use of the terms
manufacturer/exporter and exporter and the CIT's determination that China First
and Three Star antidumping rates were producer rates notwithstanding
Commerce's characterization of these rates as exporter rates.

> Commerce may be free to choose a variety of means to give reasonable notice that certain exporters' goods are subject to an administrative review, but before taking action that significantly affects parties such as Transcom, it must provide some form of notice that the administrative review may result in an increase in the importer's liability by affecting the antidumping duty rates applicable to its foreign exporters. Because no such notice was provided in this case, the final results of the fourth, fifth, and sixth administrative reviews of the tapered roller bearing antidumping order cannot be sustained as they apply to the entries derived from Transcom's unnamed exporters.

*Id.* Similarly, Michaels was not provided adequate notice in this case. Michaels appropriately relied on the plain language of the applicable regulation in assessing its antidumping liability. To dramatically increase duties against Michaels based on an unlawful interpretation of the regulation that is at odds with this plain language would unfairly penalize Michaels.[20]

## CONCLUSION AND RELIEF REQUESTED

For the foregoing reasons, Michaels requests the Court overturn the CIT's summary judgment finding and remand this case to Commerce to apply 19 C.F.R.

---

[20] The CIT completely misconstrued Michael's argument when it stated that:

> Under Michaels' theory, Commerce would be required to list every PRC-controlled exporter, known or unknown, in its investigation and indicate that each exporter's entries will be assessed at a specific rate, the PRC-wide rate.

*Michaels II* at 18. In fact, the position advocated by Michaels (and the position set forth in the regulations) is that the relevant rate is the producer's rate. This is a very workable approach that does not present any of the difficulties that Commerce and the CIT alleged.

§ 351.107(b)(2) to these entries. Michaels further requests that the Court order re-liquidation of the relevant entries subject to this case at the appropriate separate rate (as deposited by Michaels upon entry) based on the Chinese producer of the pencils, rather than the PRC-wide rate of 114.90 percent. The Court should also order that Michaels be refunded excess duties paid as appropriate, with interest, and that further relief be provided as appropriate.

Respectfully submitted,

/s/ Matthew R. Nicely
Matthew R. Nicely
    *Counsel of Record*
Lynn G. Kamarck
Hughes Hubbard & Reed LLP
1775 I Street, N.W.
Washington, DC 20006-2401
Telephone: (202) 721-4750
Facsimile: (202) 721-4646

*Counsel for Michaels Stores, Inc.*

Dated: February 3, 2014

## CERTIFICATE OF SERVICE

I hereby certify that I filed the foregoing Brief for Plaintiff-Appellant Michaels Stores, Inc. with the Clerk of the United States Court of Appeals for the Federal Circuit via the CM/ECF system and served a copy on counsel of record by electronic mail to the party on service list below.

Stephen Carl Tosini
Department of Justice
Commercial Litigation Branch, Civil
Division
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
(202) 616-5196
stephen.tosini@usdoj.gov

Dated: February 3, 2014                     /s/ Matthew R. Nicely
                                            Matthew R. Nicely
                                            *Counsel for Michaels Stores, Inc.*

## CERTIFICATE OF COMPLIANCE

Counsel for Plaintiff-Appellant Michaels Stores, Inc. hereby certifies that:

1. The brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B)(i) because exclusive of the exempted portions it contains 9,129 words as counted by the word processing program used to prepare the brief; and

2. The brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared using Microsoft Office Word 2010 in a proportionally spaced typeface: Times New Roman, font size 14.

Dated: February 3, 2014              /s/ Matthew R. Nicely
                                     Matthew R. Nicely
                                     *Counsel for Michaels Stores, Inc.*

# ADDENDUM

Slip Op. 13- 110

## UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **MICHAELS STORES, INC.,** | |
| Plaintiff, | |
| v. | **Before: Jane A. Restani, Judge** |
| **UNITED STATES,** | **Court No. 12-00146** |
| Defendant. | **Public Version** |

## <u>OPINION</u>

[Plaintiff's motion for summary judgment in antidumping duty matter is denied, and summary judgment is entered in favor of defendant.]

Dated: August 21, 2013

Lewis E. Leibowitz, Craig A. Lewis, Eric B. Gillman, and Wesley V. Carrington Hogan Lovells US LLP, of Washington, DC, for plaintiff.

Carrie A. Dunsmore, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, for defendant. With her on the brief were Stuart F. Delery, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Patricia M. McCarthy, Assistant Director. Of counsel on the brief was Daniel J. Calhoun, Attorney, United States Department of Commerce.

Restani, Judge: This matter is before the court following denial of Defendant

United States' motion to dismiss in Michaels Stores, Inc. v. United States, Slip Op. 12-161, 2012

Ct. Int'l Trade LEXIS 161 (Dec. 27, 2012). Plaintiff Michaels Stores, Inc. ("Michaels")

challenges the liquidation and cash deposit instructions issued by the Department of Commerce

("Commerce") in administering the antidumping duty ("AD") order for certain cased pencils

from the People's Republic of China ("PRC"). See Antidumping Duty Order: Certain Cased

Pencils from the People's Republic of China, 59 Fed. Reg. 66,909, 66,909 (Dep't Commerce

Dec. 28, 1994) ("Cased Pencils Initial Order").  For the reasons below, the court determines that

Commerce lawfully issued liquidation instructions covering the 2008–2009 and 2009–2010

administrative review periods for certain cased pencils that were imported by Michaels.

BACKGROUND

At issue in this case is the content of liquidation instructions issued following

administrative reviews covering two periods of review ("POR"), the 2008–2009 POR and the

2009–2010 POR, both arising out of the 1994 AD order on cased pencils.  See Initiation of

Antidumping and Countervailing Duty Administrative Reviews, Request for Revocation in Part,

and Deferral of Initiation of Administrative Review, 75 Fed. Reg. 4770, 4771 (Dep't Commerce

Jan. 29, 2010) ("Initiation of Administrative Review 2010"); Initiation of Antidumping and

Countervailing Duty Administrative Reviews, 76 Fed. Reg. 5137 (Dep't Commerce Jan. 28,

2011) ("Initiation of Administrative Review 2011").  The parties appear to agree on the facts

presented below.

During the 2008–2009 POR, Michaels purchased goods that had been produced

by three manufacturers of cased pencils, China First Pencil Co., Ltd. ("China First"), Shanghai

Three Star Stationery Industry Co., Ltd. ("Three Star"), and Shandong Rongxin Import and

Export Co., Ltd. ("Rongxin").  Mem. of Points & Authorities in Supp. of Pl.'s Mot. for Summ. J.

("Pl.'s Mem.") at 2; Def.'s Resp. to Pl.'s Mot. for Summ. J. ("Def.'s Resp.") at 6.  Michaels

received these pencils from three different PRC exporters.  Pl.'s Mem. at 2; Def.'s Resp. at 6.

Similarly, during the 2009–2010 POR, Michaels purchased goods that had been produced by two

manufacturers, China First and Rongxin.  Pl.'s Mem. at 6; Def.'s Resp. at 12.  Again, Michaels

did not receive the pencils directly from these producers, but instead it received them from two

different PRC exporters.[1]  Pl.'s Mem. at 6; Def.'s Resp. at 12.

        The cash deposit instructions issued by Commerce, to which the liquidation

instructions referred, informed U.S. Customs and Border Protection ("Customs") that "if any

entries of this merchandise are exported by a firm other than the <u>exporters</u> listed above, then the

following instructions apply."  Pl.'s Mem. Ex. 6 at 1–2, Ex. 9 at 2, Ex. 11 at 1–2 (emphasis

added).  Commerce first ordered Customs to use a separate rate "[i]f the PRC or non-PRC

<u>exporter</u> of the subject merchandise has its own rate."[2]  <u>Id.</u> (emphasis added).  Because the

exporters of the subject merchandise were not given separate rates in the instructions, Customs

continued to the second paragraph, which required Customs to apply the PRC-wide rate to

subject merchandise "[f]or all PRC exporters of subject merchandise which have not been

assigned to a separate rate."[3]  <u>Id.</u>  As a result, although the cash deposit instructions included

separate rates for the companies that produced the merchandise in question, those rates applied

---

[1] Collectively, the exporters from which Michaels received the merchandise in question
will be referred to as the "subject" exporters.  Michaels refers to these exporters that were not
individually reviewed as the "unreviewed" exporters, but this term is a misnomer, as the court
concludes that these exporters, in fact, were reviewed collectively as part of the PRC-wide entity.

[2] Commerce's separate rate procedure is not compelled by statute.  Instead, Commerce's
procedure requires companies in nonmarket economies ("NME") to assert their independence to
avoid being classified as part of the PRC-wide entity.  Mandatory respondents may apply for
separate rate status through an antidumping questionnaire response, and nonmandatory
respondents may apply through a separate rate application.  <u>See</u> <u>Yangzhou Bestpak Gifts &
Crafts Co. v. United States</u>, 716 F.3d 1370, 1374 (Fed. Cir. 2013).

[3] Here, Commerce's instructions, rather than the ministerial implementation of those
instructions, are at issue as jurisdiction is asserted under 28 U.S.C. § 1581(i).  A parallel case has
been filed under § 1581(a) that addressed the protests filed by Michaels related to the
appropriateness of Custom's actions in implementing the instructions.  <u>Michaels Stores, Inc. v.
United States</u>, Ct. No. 12-145 (CIT filed May 23, 2012).  For purposes of this action, Michaels
claims that Commerce's instructions were clear on their face, provided no discretion to Customs,
and were contrary to law.

only when those companies directly exported the merchandise to the United States.  See id.

During both PORs, Michaels made cash deposits for the entries of cased pencils

with Customs pursuant to Michaels' interpretation of the AD order.  Pl.'s Mem. at 2, 6.  The

corresponding cash deposit instructions indicated that the cash deposit rate for exporters not

specifically listed and without a separate rate, however, was "the PRC-wide rate of 114.90

percent."[4]  Id.  Michaels instead made cash deposits at the cash deposit rates assigned to the

corresponding producer of the pencils.  Pl.'s Mem. at 2, 6; Def.'s Resp. at 6, 12.  While

Commerce initiated administrative reviews of some of the producers at issue here, certain

producers withdrew their requests for administrative review, and Commerce reviewed only one

of the producers at issue here, Rongxin, and only for the 2008–2009 POR.  Final Results 2011,

76 Fed. Reg. at 27,989.  None of the subject exporters were specifically identified by Commerce,

and none of the subject exporters requested a review.  See Certain Cased Pencils From the

People's Republic of China: Preliminary Results and Partial Rescission of Antidumping Duty

Administrative Review, 76 Fed. Reg. 2337, 2339 (Dep't Commerce Jan. 13, 2011) ("Partial

Rescission of AD Review"); Certain Cased Pencils From the People's Republic of China:

Rescission of Antidumping Duty Administrative Review, 76 Fed. Reg. 27,990, 27,990 (Dep't

Commerce May 13, 2011) ("Rescission of AD Review").  For both PORs, Commerce issued

_____

[4] Although the PRC-wide entity was not specifically examined for this particular POR,
the PRC-wide rate applied here was "the rate established in the administrative review for the
most recent period."  Certain Cased Pencils From the People's Republic of China: Final Results
of the Antidumping Duty Administrative Review, 76 Fed. Reg. 27,988, 27,989 (Dep't Commerce
May 13, 2011) ("Final Results 2011").  Commerce most recently conducted a reexamination of
the PRC-wide entity for the 2007–2008 POR and confirmed the PRC-wide rate to be 114.90
percent.  See Certain Cased Pencils From the People's Republic of China: Final Results of the
Antidumping Duty Administrative Review, 75 Fed. Reg. 38,980, 38,981 (Dep't Commerce July
7, 2010) ("Final Results 2010").

liquidation instructions, ordering Customs to liquidate the subject entries at the cash deposit rate

in effect at the time of entry.  Pl.'s Mem. at 2–4, 7–8; Def.'s Resp. at 8, 10, 14–15.

   Furthermore, following the 2008–2009 administrative review of Rongxin,

Commerce issued a producer's rate for Rongxin of 0.17 percent.  Pl.'s Mem. at 4; Def.'s Resp. at

9.  Commerce also issued "exporter/importer-specific"[5] liquidation instructions for Rongxin

without including Michaels on the importer list.[6]  Def.'s Resp. at 9–10.  Consequently, for

pencils manufactured by Rongxin during the 2008–2009 POR that were purchased by Michaels

through a different export company, Customs also liquidated these entries at a rate equal to the

---

[5] Commerce repeatedly referred to "exporter/importer-specific" rates, but that term is not defined in the statute or regulations.  Instead, Commerce apparently uses this term to refer to the rate calculated for the subject merchandise when it enters the United States pursuant to § 351.212 of its regulations.  See 19 C.F.R. § 351.212(b)(1); see also Final Results 2011, 76 Fed. Reg. at 27,989 (referencing § 351.212(b)(1) as the source of the "exporter/importer-specific" or "customer-specific" rate).  The regulation, to which Commerce referred, provides:

> If the Secretary has conducted a review of an antidumping order under § 351.213 (administrative review), § 351.214 (new shipper review), or § 351.215 (expedited antidumping review), the Secretary normally will calculate an assessment rate for each importer of subject merchandise covered by the review.  The Secretary normally will calculate the assessment rate by dividing the dumping margin found on the subject merchandise examined by the entered value of such merchandise for normal customs duty purposes.  The Secretary then will instruct the Customs Service to assess antidumping duties by applying the assessment rate to the entered value of the merchandise.

19 C.F.R. § 351.212(b)(1).  Of course, an assessment rate is not a less than fair value rate, i.e. the dumping rate, but a rate based on the value of the entered merchandise, as noted in the regulation.  Id.

[6] [[

       ]]  See Def.'s Confidential App. in Supp. of its Resp. to Pl.'s Mot. for Summ. J. at A30–32 ("Def.'s Confidential App.").

*Confidential Information Deleted*

PRC-wide rate of 114.90 percent.  Def.'s Resp. at 11.

Following liquidation, Michaels was assessed supplemental duties associated with

these entries, seeking the difference between the cash deposits Michaels made at the producer's

rate and liquidation at the PRC-wide rate.  Pl.'s Mem. at 6, 9.  After most of Michaels' protests

with Customs were unsuccessful, Michaels filed the present action.  Although defendant

attempted to dismiss the majority of Michaels' claims for lack of jurisdiction, the court denied

that motion on December 27, 2012.  See Michaels Stores, 2012 Ct. Int'l Trade LEXIS 161, at *4.

### JURISDICTION AND STANDARD OF REVIEW

As established in its previous opinion, the court has jurisdiction pursuant to 28

U.S.C. § 1581(i) (2006).[7]  The court will find unlawful an action by Commerce if it is "arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C.

§ 706(2)(A); see 28 U.S.C. § 2640(e) (directing the court to evaluate 28 U.S.C. § 1581(i) cases

under the standards set forth in the Administrative Procedure Act).  Moreover, the court will find

---

[7] The court's jurisdiction is proper despite defendant's claim that Michaels did not properly exhaust administrative remedies by participating in the administrative review. Defendant misrepresents the scope and purpose of an administrative review, which does not provide a remedy for improperly issued liquidation instructions.  Def.'s Resp. 32–34.  Rather, an administrative review simply allows a company to challenge its rate.  See Consol. Bearings Co. v. United States, 348 F.3d 997, 1003–04 (Fed. Cir. 2003) (refusing to hold that a company, which did not request an administrative review, failed to satisfy the exhaustion doctrine when challenging liquidation instructions, recognizing that an administrative review cannot serve as a challenge to the validity of liquidation instructions because an administrative review can only challenge the rate calculated and not instructions issued by Commerce).  In this case, Michaels does not challenge the PRC-wide rate, its producers' rates, or request its own or an exporter's separate rate.  Rather it challenges how Commerce interprets a regulation dictating final liquidation.  In fact, the court already made clear in this case that there are no jurisdictional concerns related to exhaustion of remedies.  See Michaels Stores, 2012 Ct. Int'l Trade LEXIS 161, at *4.  Further, the regulation at issue is not completely clear, and Michaels is not charged with knowing how Commerce finally would interpret it, to the extent this is a discretionary issue.

that Commerce has abused its discretion if its "decision (1) is clearly unreasonable, arbitrary, or

fanciful; (2) is based on an erroneous conclusion of law . . . or (4) follows from a record that

contains no evidence on which [Commerce] could rationally base its decision." See Sterling Fed.

Sys. v. Goldin, 16 F.3d 1177, 1182 (Fed. Cir. 1994) (quoting Gerritsen v. Shirai, 979 F.2d 1524,

1529 (Fed. Cir. 1992)).

## DISCUSSION

### I.      Michaels' Motion for Summary Judgment

After apparently conceding that the administrative record[8] would not be sufficient

to adjudicate this case, defendant incorrectly argues that Michaels' motion for summary

judgment is improper. See Def.'s Resp. at 20. Under 28 U.S.C. § 1581(i)(4), the court has

jurisdiction over civil actions pertaining to the "administration and enforcement" of certain

actions taken by Commerce. Summary judgment is proper if "there is no genuine dispute as to

any material fact and the movant is entitled to judgment as a matter of law." USCIT R. 56(a).

Therefore, when the plaintiff's "case hinges on pure questions of law, resolution by summary

judgment is appropriate." Can. Wheat Bd. v. United States, 32 CIT 1116, 1121, 580 F. Supp. 2d

1350, 1356 (2008) (finding summary judgment appropriate in a § 1581(i) case).

A motion for summary judgment, as opposed to judgment on the agency record, is

---

[8] Defendant contends that Michaels was required to move for judgment on the agency record rather than summary judgment, thereby limiting the court's review to the agency record related to the liquidation instructions, preventing Michaels from referencing the cash deposit instructions. See Def.'s Resp. at 20. Defendant admits, however, that Michaels could have moved to supplement the agency record and that the liquidation instructions incorporate, by reference, the cash deposit instructions. Id. Thus, the cash deposit instructions were in substance part of the record. Michaels' motion for summary judgment merely included in concrete form what should have been in the record, with the same result. Further amelioration in this regard is unnecessary.

appropriate in this case because Michaels' arguments do not challenge the final results of an

administrative review.  Michaels merely challenges the liquidation instructions and, only by

reference, the cash deposit instructions.  The liquidation instructions are not part of an

administrative review but rather implement the results of a review.  Pl.'s Mem. at 17, 19, 22; see

Consol. Bearings Co. v. United States, 348 F.3d 997, 1002 (Fed. Cir. 2003) (distinguishing

between a challenge to the final results of administrative review and a challenge to liquidation

instructions).  Consequently, just as in Canadian Wheat Board where the plaintiffs properly

challenged a notice of revocation with a motion for summary judgment, here the "true nature" of

Michaels' argument is a challenge to the administration and enforcement of Commerce's final

determination and not to the determination itself.  See 32 CIT at 1127, 580 F. Supp. 2d at 1356.

Thus, Michaels' motion for summary judgment is properly before the court.[9]

## II.    Appropriateness of Michaels' Cash Deposit Instructions Claims

            Defendant contends that Michaels is barred from disputing the lawfulness of the

cash deposit instructions because: (1) Michaels did not explicitly raise the issue in its complaint,

(2) Michaels' challenges to the cash deposit instruction are time barred, and (3) the court lacks

subject matter jurisdiction because Michaels failed to exhaust all remedies.[10]  Def.'s Resp. at

---

    [9] Additionally, the court will interpret the United States' prayer for relief seeking
judgment in its favor as a cross motion for summary judgment.  Def.'s Resp. at 34 ("[Defendant]
respectfully request[s] that the Court deny plaintiff's motion and enter judgment in favor of the
United States."); see Shell Oil Co. v. United States, 781 F. Supp. 2d 1313, 1322 (CIT 2011)
("[S]ummary judgment may be granted sua sponte in favor of the non-moving party, or even in
the absence of any motion, provided that all parties are afforded an appropriate opportunity to
come forward with relevant evidence." (citing Celotex Corp. v. Catrett, 477 U.S. 317, 326
(1986)), aff'd, 688 F.3d 1376 (Fed. Cir. 2012).

    [10] The issue of exhaustion is dealt with above.  To reiterate, requesting an administrative
(continued...)

29–34.  Moreover, defendant contends that even if Michaels can challenge indirectly the cash deposit instructions, those instructions are lawful.  Def.'s Resp. at 24–29.  Here, the court addresses whether Michaels properly asserted a challenge to the cash deposit instructions as part of the liquidation instructions.

The court simply requires that pleadings contain "a short and plain statement of the claim showing that the pleader is entitled to relief . . . which may include . . . different types of relief."  USCIT R. 8(a)(2)–(3); see also USCIT R. 8(f) ("Pleadings must be construed so as to do justice").  Pleadings are sufficient if they adequately notify the defendant of "what the . . . claim is and the grounds upon which it rests."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (quoting Conley v. Gibson, 355 U.S. 41, 47 (1957)).  Separately, a cause of action under 28 U.S.C. § 1581(i) "is barred unless commenced . . . within two years after the cause of action first accrues."  28 U.S.C. § 2636(i).

Defendant fails to demonstrate that all claims referencing the cash deposit instructions should be disregarded.  Even though the initial complaint did not mention explicitly the cash deposit instructions, defendant was put on notice that Michaels intended to challenge the validity of those cash deposit instructions because Michaels expressly challenged the liquidation rate that was set by reference to the cash deposit instructions.  Compl. ¶¶ 1, 29–31, 43–44, 47, 50; Pl.'s Mem. Ex. 6 at 69, Ex. 9 at 84, Ex. 11 at 91.  Defendant acknowledges that Michaels' complaint alleges that the liquidation instructions were improper.  Def.'s Resp. at 30.  Michaels has consistently advanced one argument, that the liquidation instructions were improper, and it

---

[10](...continued)
review would not remedy improper liquidation instructions, even though they reference deposit instructions; therefore, it is not a remedy that must be exhausted.

simply clarified in its motion for summary judgment that Commerce's allegedly unlawful

conduct likely stems back to the cash deposit instructions, as plaintiff now understands how

Commerce construes the deposit rate instructions. Therefore, the complaint sufficiently put

defendant on notice because it alleged that the cash deposit instructions that were incorporated

into the liquidation instructions, were incorrect. Pl.'s Reply Br. to Def.'s Resp. to Pl.'s Mot. for

Summ. J. ("Pl.'s Reply") at 6; see Twombly, 550 U.S. at 555 (describing the requirement of fair

notice in the context of the analogous Federal Rule of Civil Procedure). As a result, defendant

cannot claim that it was surprised by Michaels' claims and arguments raised here.

      Moreover, this claim is not time-barred because the cause of action accrued once

the liquidation instructions were issued and final duties were assessed on Michaels' entries.[11]

Michaels can challenge the lawfulness of the liquidation instructions that give final effect to the

cash deposit instructions, as interpreted by Commerce.[12] See Pl.'s Mem. at 11–12; Def.'s Resp.

at 8, 13, 15. Until the liquidation instructions were issued for plaintiff's specific merchandise

and it was liquidated, Commerce's final interpretation of the deposit instructions and their

meaning as to plaintiff's merchandise were not definitive.

---

[11] The liquidation instructions under which Michaels' entries were liquidated were issued on July 15, 2011, with respect to the 2008–2009 POR, and June 1, 2011, with respect to the 2009–2010 POR. Def.'s Public App. in Supp. of Its Resp. to Pl.'s Mot. for Summ. J. at A6–7, A16–17. The summons and complaint in this case were filed on May 23, 2012, Dkt. Entry Nos. 1, 5, well within the applicable statute of limitations. See 28 U.S.C. § 2636(i) (providing for a two year statute of limitations).

[12] The United States operates a retrospective system of antidumping duties, where the final dumping margin is not calculated until after the subject merchandise has already been imported. See 19 C.F.R. § 351.212(a); SSAB N. Am. Div. v. United States, 32 CIT 795, 797–98, 571 F. Supp. 2d 1347, 1350–51 (2008) (describing the retrospective system and the importance of both cash deposits and suspension of liquidation).

## III.    Content of Commerce's Cash Deposit and Liquidation Instructions

Michaels argues that Commerce should have used the producer's rate to determine the cash deposit rate, and ultimately the liquidation rate, applicable to the entries of the subject merchandise, instead of utilizing the PRC-wide rate, which Michaels characterizes as an "all others" rate. See Pl.'s Mem. at 15–17. Defendant argues, in effect, that the PRC-wide rate serves as a noncombination rate assigned to all PRC exporters who have not obtained a separate rate, given the presumption of state control in NMEs,[13] and therefore is applicable here. Def.'s Resp. at 24–26. Accordingly, the only dispute here is whether the PRC-wide rate for the PRC-entity serves as a specific, i.e. noncombination, rate applicable to the subject exporters.[14] Because Commerce has an established policy of treating non-separate NME companies as a single entity, unless they prove that they are not under state control,[15] Commerce issued lawful instructions when it treated the subject exporters as part of the PRC-entity. Stated otherwise,

---

[13] Although the continued presumption of state control within an NME like the PRC has been questioned in other cases, the PRC remains classified by Commerce as an NME. See 19 U.S.C. § 1677(18) (defining an NME). Compare GPX Int'l Tire Corp. v. United States, 893 F. Supp. 2d 1296, 1304 (CIT 2013) (discussing countervailing duties, in a recent case, and noting that "Commerce based its change in policy on the evolution of China's economy from a centrally-controlled monolithic economy towards a market economy"), with Sigma Corp. v. United States, 117 F.3d 1401, 1405–06 (Fed. Cir. 1997) (noting Commerce's practice, in an earlier case, that "because the PRC is a nonmarket economy, all commercial entities in the country are presumed to export under the control of the state." (emphasis added)). The court does not discuss the continued validity of this presumption because Michaels has not challenged the classification of the PRC as an NME or otherwise challenged the presumption.

[14] Although this is the central dispute between the parties, the issue is not clearly argued in the briefs.

[15] Michaels has not challenged the validity or reasonableness of Commerce's separate rate methodology, and therefore, the court does not address that question here. Michaels instead claims that Commerce failed to follow its own regulations.

because the subject exporters did not seek separate rates, they are reviewed as part of the

collective PRC-entity and assigned the PRC-wide rate, not a separate rate or a separate

combination exporter/producer rate, as will be explained further.

Commerce's actions in determining the appropriate cash deposit rate for

nonproducing exporters where an AD order is in place are governed by 19 C.F.R. § 351.107

(2013).  It provides, in relevant part:

> [I]f the Secretary has not established previously a combination cash deposit rate
> . . . for the exporter and producer in question or a noncombination rate for the
> exporter in question, the Secretary will apply the cash deposit rate established for
> the producer.  If the Secretary has not previously established a cash deposit rate
> for the producer, the Secretary will apply the "all-others" rate . . . ."

Cash Deposit Rates for Nonproducing Exporters; Rates in Antidumping Proceedings Involving a

Nonmarket Economy Country, 19 C.F.R. § 351.107(b)(2).  Combination and noncombination

rates in market economies ("ME") are company-specific rates,[16] and the all others rate typically is

the weighted average of the rates for the companies investigated, with certain exclusions.  19

U.S.C. § 1673d(c)(1)(B)(i), (c)(5).  The regulations clarify, however, that for non-market

economies, "'rates' may consist of a single dumping margin applicable to all exporters and

producers."  19 C.F.R. § 351.107(d).  Moreover, whenever the statute is silent on a particular

issue, it is well-settled that Commerce may "formulate policy and make rules 'to fill any gap left,

implicitly or explicitly, by Congress.'"  SKF USA Inc. v. United States, 254 F.3d 1022, 1030

(Fed. Cir. 2001) (quoting Chevron U.S.A., Inc. v. Nat'l Res. Def. Council, Inc., 467 U.S. 837,

---

[16] Although 19 U.S.C. § 1673d does not define noncombination rates, a plain reading of
19 C.F.R. § 351.107(b)(2) makes clear that a noncombination rate and an all others rate are
distinct concepts because they are listed as different options for Commerce to utilize in assigning
the appropriate rate.

843 (1984)).

The regulations above define Commerce's practice of determining the appropriate cash deposit rates in the ME context, by providing a sequence of options. NMEs are treated differently because Commerce applies a presumption of state control in NME countries over both producers and exporters. Separate Rates and Combination Rates in Antidumping Investigations Involving Non-Market Economy Countries, 70 Fed. Reg. 17,233, 17,233 (Dep't Commerce Apr. 5, 2005). Pointing to this presumption of state control, Commerce rejected the idea that it should assign cash deposit rates to entries based on the identity of the producer of the merchandise as opposed to the identity of the nonproducing exporter. See Antidumping Duties; Countervailing Duties, 62 Fed. Reg. 27,296, 27,303, 27,305 (Dep't Commerce May 19, 1997) ("Preamble") (explaining that the new regulation does not alter Commerce's practice in NME cases). Both parties agree that at issue in this case are nonproducing exporters in the NME context, which requires the application of 19 C.F.R. § 351.107(b)(2) in conjunction with (d) to determine the cash deposit rate. Pl.'s Mem. at 2, 6; Def.'s Resp. at 6, 12.

For non-producing exporters, like trading companies, Commerce has said that it "intend[s] to continue calculating AD rates for NME export trading companies, and not the manufacturers supplying the trading companies." Preamble, 62 Fed. Reg. at 27,305 (providing Commerce's first clarification of § 351.107). As a result, under Commerce's present methodology, exporters are required to prove that they are not part of the NME-wide entity to be eligible for a separate rate, which occurs through a formal investigation process. See Transcom, Inc. v. United States, 294 F.3d 1371, 1381 (Fed. Cir. 2002) ("Commerce made clear the consequences to an exporter of not rebutting the presumption of state control and establishing its

independence: the exporter would be assigned the single rate given to the NME entity").[17]  Only

upon achieving separate rate status can an exporter be eligible for the NME equivalent of the all

others rate for separate rate companies.  See Yangzhou Bestpak, 716 F.3d at 1374 ("The separate

rate for eligible non-mandatory respondents is generally calculated following the statutory

method for determining the 'all others rate.'").  Failure to qualify for a separate rate means that

Commerce will analyze the exporter through the lens of the presumption of state control.  See id.

at 1373 (citing Sigma Corp., 117 F.3d at 1405).

        During the POR, liquidation is suspended for all entries of covered goods until

Commerce concludes its review, if any.  Then, liquidation instructions are issued by Commerce

to Customs to liquidate at either the review rate or at the appropriate cash deposit rate if the

company is not reviewed.  19 C.F.R. § 351.212(b),(c)(1)(i).  Here, all of the merchandise from

the subject exporters was liquidated pursuant to these instructions at the PRC-wide rate.  Pl.'s

Mem. at 6, 9.

        In the present matter, although all of the producers of cased pencils imported by

Michaels during the PORs in question were individually investigated and assigned their own

rates, those rates are irrelevant to the exporters' rates because the regulation calls for the rates of

---

[17] This presumption of state control and the separate rate analysis is explained in more detail by Commerce's various policies and orders.  See Policy Bulletin 05.1: Separate-Rates Practice and Application of Combination Rates in Antidumping Investigations involving Non-Market Economy Countries at 4 (Apr. 5, 2005), available at http://ia.ita.doc.gov/policy/bull05-1.pdf (last visited Aug. 19, 2013) ("Policy Bulletin 05.1") (requiring a company to prove to Commerce a lack of de facto and de jure control to achieve separate rate status); see, e.g., Brake Rotors From the People's Republic of China: Rescission of Second New Shipper Review and Final Results and Partial Rescission of First Antidumping Duty Administrative Review, 64 Fed. Reg. 61,581, 61,583 (Dep't Commerce Nov. 12, 1999) (engaging in an analysis of de facto and de jure control related to Commerce's rebuttable presumption of state control).

the exporters to be used, if such exist, prior to looking at the producers' rates. 19 C.F.R.

§ 351.107(b)(2). Here, the PRC-wide rate serves as a noncombination rate for these

nonproducing exporters because § 351.107(d) of the regulation sheds light on the meaning of

§ 351.107(b)(2). The regulation indicates that for an AD proceeding involving an NME, such as

the PRC in the present case, the term "rate" can be read to include the possibility of a single rate

for exporters, producers, or both. See 19 C.F.R. § 351.107(d). This "single rate" here is the

PRC-wide rate.

            Although Commerce allows exporters to apply for separate rates, no evidence

exists, in this instance, that the exporters used by Michaels did so. Therefore, the subject

exporters were not eligible for separate rates and were presumed by Commerce to be under state

control. See Transcom, 294 F.3d at 1381–82 (affirming the CIT's decision to sustain

Commerce's separate rate NME procedure); cf. Certain Oil Country Tubular Goods From the

People's Republic of China: Final Determination of Sales at Less Than Fair Value, Affirmative

Final Determination of Critical Circumstances and Final Determination of Targeted Dumping, 75

Fed. Reg. 20,335, 20,338, 20,340 (Dep't Commerce Apr. 19, 2010) (utilizing the PRC-wide rate

for exporters not individually examined for separate rate status, but providing separate rates to

exporters who applied for and established independence and were individually examined).

Rather, this failure to apply for separate rate status resulted in the use of the single PRC-wide rate

for the exporters in question under Commerce's methodology.[18]

––––––––––––––––––––––––––

[18] Michaels attempts to differentiate the cased pencils that were produced by Rongxin.
Pl.'s Mem. 13–14. Commerce acted lawfully and reasonably here as well by liquidating the
entries manufactured by Rongxin, but exported by non-separate rate companies, at the PRC-wide
rate. Michaels admits that Rongxin was not the exporter of the goods but simply the

                                                                              (continued...)

Both sides also raise the additional issue of the change in Commerce's NME

policy,[19] but the policy is of no consequence because it impacts only situations in which there is

an exporter that is given a separate rate.[20] Pl.'s Mem. at 23–24; Def.'s Resp. at 28–29; see Non-

Market Economy Antidumping Proceedings: Assessment of Antidumping Duties, 76 Fed. Reg.

65,694, 65,694–95 (Dep't Commerce Oct. 24, 2011) ("Assessment of AD Duties, Notice of

Policy").[21] Here, the court has already concluded that the subject exporters did not apply for a

---

[18](...continued)
manufacturer. Id. at 20. Again, this exporter was not eligible for a separate rate because it had not applied through Commerce's separate rate procedure. Instead, Commerce applied the PRC-wide rate for the exporter because it was presumed to be a part of the PRC-wide entity. Accord Royal United Corp. v. United States, 714 F. Supp. 2d 1307, 1311 n.6 (CIT 2010) (collecting cases upholding Commerce's practice of notifying unnamed exporters from the relevant NME that they will be subject to the results of the review as part of the NME entity unless they establish their separate rate status).

[19] This issue is raised only in reference to the liquidation rate of cased pencils produced by Rongxin during the 2008–2009 POR. See Pl.'s Mem. at 23.

[20] Although Michaels argues that this policy is more than a refinement and constitutes a significant change, based on the Federal Circuit's comments on an analogous change in the ME context in Parkdale Int'l v. United States, 475 F.3d 1375, 1379 (Fed. Cir. 2007), Parkdale does not affect the analysis in this case because the court has determined that the policy does not apply to the subject exporters. Accordingly, the court will not decide whether the NME policy refinement constitutes a "significant change," but the court notes that this situation is different from the change in policy for MEs, given the presumption of state control in the NME context.

[21] Commerce's policy "refinement" states:

[F]or merchandise entered at the separate rate applicable to a reviewed exporter, but which . . . . are not reported in the reviewed company's U.S. sales databases submitted to the Department during an administrative review, or otherwise determined not covered by the review (i.e., the reviewed exporter claims no shipments), the Department will instruct [Customs] to liquidate such entries at the NME-wide rate as opposed to the company-specific rate declared by the importer at the time of entry.

(continued...)

separate rate through Commerce's separate rate procedure.  Additionally, the policy may be of

little consequence given a 2005 policy by Commerce that clarifies that an exporter's entries are

not eligible for separate cash deposit rates if the corresponding merchandise is not reported by

the producer during the investigation or review.  See Policy Bulletin 05.1 at 6–7.

      Moreover, defendant's position here is not a post-hoc rationalization, as Michaels

puts it, but instead it logically flows from Commerce's previous statements and policies

regarding exporters in NMEs.  See Pl.'s Reply at 16.  Specifically, Commerce legitimately

attempts to prevent NME companies from avoiding Commerce's AD orders.  The language in

§ 351.107(d), when read in conjunction with § 351.107(b)(2), upholds two key policy rationales

in the NME context: that an exporter's rate is preferable to a producer's rate as the exporter is

likely the party to set prices and know which goods are destined for the United States, and that

each exporter has the burden of proving it is eligible for a separate rate. See Since Hardware

(Guangzhou) Co. v. United States, Slip Op. 10-108, 2010 Ct. Int'l Trade LEXIS 119, at *3–4

(Sep. 27, 2010) (quoting Sigma Corp., 117 F.3d at 1405–06 (explaining that exporters have more

information related to issues of state control)); Preamble, 62 Fed. Reg. at 27,303–05.  Therefore,

even though the producers had separate rates, Commerce's concern remains that these producers

will use a state-controlled exporter, allowing the state to dump the goods through that exporter

while benefitting from the producer's lower rate.[22]

---

[21](...continued)
Assessment of AD Duties, Notice of Policy, 76 Fed. Reg. at 65,694 (emphasis added).

    [22] This concern is especially evident when the producer does not know or report the
ultimate destination of its goods that are eventually purchased by a PRC-based exporter and sent

(continued...)

It is not that the producer's rate will never be used by Commerce in the NME

context; the producer, however, may need to export the goods itself or use a separate rate

exporter to avoid the PRC-wide rate.  Under Michaels' theory, Commerce would be required to

list every PRC-controlled exporter, known or unknown, in its investigation and indicate that each

exporter's entries will be assessed at a specific rate, the PRC-wide rate.  Not only is this burden

on Commerce possibly impracticable, but this also could allow PRC firms to establish new,

unlisted exporters that have not applied for a separate rate to export their goods during a new

POR, avoiding the PRC-wide rate, and possibly avoiding review.  See Royal United, 714 F.

Supp. 2d at 1310 (noting Commerce's practice that every exporter from an NME country that is

not particularly referenced in the review is in fact "covered by the results of the review" and is

assessed the NME-wide rate).[23]  Instead, Commerce presumes the PRC to be one entity with one

PRC-wide rate to prevent such conduct.

Thus, Commerce lawfully applied the PRC-wide rate to the subject exporters

because the PRC-wide rate constitutes a noncombination rate for exporters that are part of the

PRC-wide entity under Commerce's methodology.  Consequently, pursuant to 19 C.F.R.

---

[22](...continued)
into the United States[[                                                                        ]].  Def.'s
Confidential App. at A27–28.  In those situations, the sales are not reviewed when calculating a
rate for the producer, a situation which could allow dumping to continue unnoticed.

[23] A new shipper is defined as "an exporter or producer that did not export, and is not
affiliated with an exporter or producer that did export, to the United States during the period of
investigation."  19 C.F.R. § 351.214(a).  Therefore, under Commerce's methodology in the NME
context, a new shipper would have to apply for separate rate status to show a lack of affiliation
with the government entity that did export during the period of investigation.

*Confidential Information Deleted*

Court No. 12-00146                                               Page 19

§ 351.107(b)(2), Commerce lawfully issued instructions ordering liquidation of these entries at the PRC-wide rate and not the producer's rate.

**CONCLUSION**

For the foregoing reasons, the court denies Michaels' motion for summary judgment. Although the United States did not move separately for summary judgment and instead requested judgment only at the conclusion of its brief, the court's holding compels the conclusion that the court should enter summary judgment in favor of the United States. Judgment will be entered accordingly.

                                        /s/ Jane A. Restani
                                             Jane A. Restani
                                                  Judge

Dated: August 21, 2013
        New York, New York

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| MICHAELS STORES, INC., | |
| Plaintiff, | |
| v. | Before: Jane A. Restani, Judge |
| UNITED STATES, | Court No. 12-00146 |
| Defendant. | |

## JUDGMENT

This case having been duly submitted for decision; and the court, after due deliberation having rendered a decision herein; Now therefore, in conformity with said decision it is hereby

ORDERED, ADJUDGED, and DECREED that judgment is entered in favor of the United States.

/s/ Jane A. Restani
Jane A. Restani
Judge

Dated: August 21, 2013
New York, New York