2014-1051
_____

UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT
_____

MICHAELS STORES, INC.,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee.

_____

Appeal from the United States Court of International Trade
in Case No. 12-CV-000146, Judge Jane A. Restani.
_____

## BRIEF OF DEFENDANT-APPELLEE, THE UNITED STATES

<div style="margin-left:45%">

STUART F. DELERY
Assistant Attorney General

JEANNE E. DAVIDSON
Director

PATRICIA M. McCARTHY
Assistant Director

</div>

OF COUNSEL:
DANIEL J. CALHOUN
Senior Attorney
Office of the Chief Counsel
 for Trade Enforcement and Compliance
U.S. Department of Commerce

STEPHEN C. TOSINI
Senior Trial Counsel
Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480
Ben Franklin Station
Washington, DC  20530

March 20, 2014

Attorneys for Defendant-Appellee

## <u>TABLE OF CONTENTS</u>

STATEMENT OF THE ISSUE ................................................................1

STATEMENT OF THE CASE ...............................................................1

STATEMENT OF FACTS ......................................................................1

    I.     The Antidumping Duty Law .................................................1

    II.    Administrative Proceedings ..................................................3

          A.    2008-09 Administrative Review ..................................4

          B.    2009-10 Administrative Review ..................................7

    III.   Trade Court Proceeding ........................................................9

SUMMARY OF THE ARGUMENT ....................................................10

ARGUMENT .......................................................................................11

    I.     Standard of Review ............................................................11

    II.    Commerce's Liquidation Instructions Were Lawful ..........12

          A.    Commerce Reasonably Assigns The China-Wide Rate To Unreviewed Exporters Without A Separate Rate................13

          B.    Commerce's Regulation Mandates Assignment Of The China-Wide Rate To Unreviewed Exporters Without A Separate Rate...........................................................................14

          C.    Commerce's Practice Mandates Assignment Of The China-Wide Rate To Unreviewed Exporters Without A Separate Rate...........................................................................17

          D.    The Trial Court Reasonably Concluded That Section 351.107(b)(2) Harms Rather Than Supports Michaels's Claim ........................................................................................19

E.    Michaels's Other Arguments Are Unpersuasive ......................20

III.    New Arguments Raised By Michaels For The First Time On
Appeal Have Been Waived And Lack Merit ......................................23

CONCLUSION ...................................................................................................26

<u>**TABLE OF AUTHORITIES**</u>

## CASES

*Amanda Foods (Viet.) Ltd. v. United States*,
   647 F. Supp. 2d 1368 (Ct. Int'l Trade 2009) ................................. 18

*Bowman Transp. Inc. v. Arkansas-Best Freight System. Inc.*,
   419 U.S. 281 (1974) .......................................................................... 11

*Burlington Truck Lines, Inc. v. United States*,
   371 U.S. 156 (1962) .......................................................................... 11

*Caterpillar Inc. v. Sturman Indus.*,
   387 F. 3d 1358 (Fed. Cir. 2004) .................................................... 23

*Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*,
   467 U.S. 837 (1984) .................................................................. 12, 17

*Coalition for the Preservation of Am. Brake Drum & Rotor Aftermarket Mfrs. v. United States*,
   44 F. Supp. 2d. 229 (Ct. Int'l Trade 1999) ................................. 13

*Consol. Bearings Co. v. United States*,
   348 F. 3d 997 (Fed. Cir. 2003) ...................................................... 11

*Datamatic Servs. v. United States*,
   909 F. 2d 1029 (7th Cir. 1990) ..................................................... 24

*GSA, S.R.L. v. United States*,
   77 F. Supp. 2d 1349 (Ct. Int'l Trade 1999) ................................ 24

*Gant v. United States*,
   417 F. 3d 1328 (Fed. Cir. 2005) .................................................... 23

*Interactive Gift Exp., Inc. v. Compuserve Inc.*,
   256 F .3d 1323 (Fed. Cir. 2001) ..................................................... 24

*Michaels Stores, Inc. v. United States*,
   931 F. Supp. 2d 1308 (Ct. Int'l Trade 2013) .......................... passim

*Michaels Stores, Inc. v. United States,*
    2012 WL 6720675 (Ct. Int'l Trade Dec. 27, 2012).........................................1

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983).........................................................................................11

*Royal United Corp. v. United States,*
    714 F. Supp. 2d 1307 (Ct. Int'l Trade 2010).................................................13

*SKF USA, Inc. v. United States,*
    254 F. 3d 1022 (Fed. Cir. 2001) ...................................................................17

*Sigma Corp. v. U.S.,*
    117 F. 3d 1401 (Fed. Cir. 1997) ............................................................13, 14

*Target Corp. v. United States,*
    Slip Op. 2010-141 (Ct. Int'l Trade Dec. 23, 2010)  21

*Thomas Jefferson Univ. v. Shalala,*
    512 U.S. 504 (1994).......................................................................................12

*Torrington Co. v. United States,*
    156 F. 3d 1361 (Fed. Cir. 1998) ...................................................................12

*Transcom, Inc. v. United States,*
    294 F. 3d 1371 (Fed. Cir. 2002) .............................................................13, 21

*United States v. Eurodif S.A.,*
    555 U.S. 305 (2009).......................................................................................12

*Walgreen Co. v. United States,*
    Slip Op. 2010-142 (Ct. Int'l Trade Dec. 23, 2010) ......................................21

## FEDERAL RULES

Ct. Int'l Trade R. 12(b)(1).......................................................................................1

# STATUTES

5 U.S.C. § 551(4) ..................................................................................................22

5 U.S.C. § 551(5) ..................................................................................................22

5 U.S.C. § 553(b)(3)(A) ...................................................................................24, 25

5 U.S.C. § 553(c) ..................................................................................................25

5 U.S.C. § 706 ......................................................................................................11

5 U.S.C. § 706(2)(A) .............................................................................................11

19 U.S.C. § 1673 ....................................................................................................2

19 U.S.C. § 1673d(a)(1) .......................................................................................13

19 U.S.C. § 1673d(c)(5) ........................................................................................17

19 U.S.C. § 1673e(a)(3) ..........................................................................................2

19 U.S.C. § 1675 ..................................................................................................13

19 U.S.C. § 1675(a) ................................................................................................2

19 U.S.C. § 1675(a)(1) ............................................................................................2

19 U.S.C. § 1675(a)(2)(B) .....................................................................................15

19 U.S.C. § 1675(2)(A) ...........................................................................................2

19 U.S.C. § 1677b .................................................................................................16

19 U.S.C. § 1677b(c) .........................................................................................2, 16

19 U.S.C. § 1677(1) ..............................................................................................13

19 U.S.C. § 1677(9)(A) ...........................................................................................5

19 U.S.C. § 1677(18) ........................................................................................2

28 U.S.C. § 1581(i) .........................................................................................11

## REGULATIONS

19 C.F.R. § 351.107 ..................................................................................passim

19 C.F.R. § 351.107(b)(1)(i) ...........................................................................20

19 C.F.R. § 351.107(b)(2)...........................................................................passim

19 C.F.R. § 351.107(d) ...............................................................................passim

19 C.F.R. § 351.211(b)(2)..................................................................................2

19 C.F.R. § 351.212(a).......................................................................................2

19 C.F.R. § 351.212(c)(1) ..................................................................................2

19 C.F.R. § 351.212(c)(1)(i) .........................................................................5, 8

## FEDERAL REGISTER NOTICES

*Antidumping and Countervailing Duty Proceedings: Assessment of
Antidumping Duties,*
    68 Fed. Reg. 23,954 (Dep't of Commerce May 6, 2003)..............................22

*Antidumping Duties; Countervailing Duties,*
    62 Fed. Reg. 27,296 (Dep't of Commerce May 19, 1997).....................18, 19

*Brake Rotors From the People's Republic of China,*
    64 Fed. Reg. 61,581 (Dep't of Commerce Nov. 12, 1999) ...........................14

*Certain Cased Pencils from China,*
    59 Fed. Reg. 66,909 (Dep't of Commerce Dec. 28, 1994) ............................3

*Certain Cased Pencils From China,*
    76 Fed. Reg. 2,337 (Dep't of Commerce June 13, 2011)...........................3, 5

*Certain Cased Pencils From China,*
    76 Fed. Reg. 27,988 (Dep't of Commerce May 13, 2011)..............................6

*Certain Cased Pencils From China,*
    76 Fed. Reg. 27,990 (Dep't of Commerce May 13, 2011)..............................8

*Certain Frozen Warmwater Shrimp From Vietnam,*
    73 Fed. Reg. 52,273 (Dep't of Commerce Sept. 9, 2008)..............................18

*Initiation of Antidumping and Countervailing Duty Administrative Reviews,*
    76 Fed. Reg. 5,137 (Dep't of Commerce Jan. 28, 2011)................................7

*Initiation of Antidumping and Countervailing Duty Administrative Reviews,*
*Request for Revocation in Part, and Deferral of Initiation of Administrative*
*Review,*
    75 Fed. Reg. 4,770 (Dep't of Commerce Jan. 29, 2010)............................4, 5

*Non-Market Economy Antidumping Proceedings: Assessment of*
*Antidumping Duties,*
    76 Fed. Reg. 65,694 (Dep't of Commerce Oct. 24, 2011) .....................22, 23

*Sparklers from the People's Republic of China,*
    56 Fed. Reg. 20,588 (Dep't of Commerce May 6, 1991)..............................14

## MISCELLANEOUS

Dep't of Commerce Policy Bulletin 05-1,
    http://ia.ita.doc.gov/policy/bull05-1.pdf..........................................................3

H.R. Doc. 103-316 (1994) ..................................................................................24

## <u>STATEMENT OF RELATED CASES</u>

Pursuant to Rule 47.5 of the Rules of this Court, we state that no appeal from this action in the United States Court of International Trade was previously before this Court.

The United States is aware of one other case pending in this or any other court that will directly affect, or be directly affected by, this Court's decision in this appeal.  Currently pending before the trial court is *Michaels Stores, Inc. v. United States*, Court No. 12-00145, in which appellant Michaels Stores, Inc. (Michaels), has separately challenged the manner in which U.S. Customs and Border Protection (CBP) implemented the liquidation instructions issued by the Department of Commerce (Commerce) that are the subject matter of this appeal.

The United States is also aware of an additional case currently pending before the trial court that may be affected by the Court's disposition of this appeal. *Michaels Stores, Inc. v. United States*, Court No. 11-00317, involves a similar challenge by Michaels to Commerce's liquidation instructions to CBP for the same product, but for a different time period.

## STATEMENT OF THE ISSUE

Whether in nonmarket economy cases, Commerce may lawfully direct assessment of antidumping duties on imported goods at a rate of duty tied to the government-controlled exporter of the subject merchandise, rather than the producer of the imported merchandise.

## STATEMENT OF THE CASE

Michaels appeals from the final judgment of the trial court which sustained liquidation instructions issued by Commerce for the 2008-09 and 2009-10 administrative reviews of the antidumping duty order on cased pencils from China. *Michaels Stores, Inc. v. United States*, 931 F. Supp. 2d 1308 (Ct. Int'l Trade 2013).

The trial court first denied the Government's Rule 12(b)(1) motion to dismiss, *Michaels Stores, Inc. v. United States*, 2012 WL 6720675 (Ct. Int'l Trade Dec. 27, 2012), and subsequently entered final judgment sustaining Commerce's instructions. *Michaels*, 931 F. Supp. 2d 1308.

## STATEMENT OF THE FACTS

### I. The Antidumping Duty Law

For nearly a century, Congress has provided a remedy to domestic industries harmed by the dumping of foreign goods into the United States at less than fair value. Pursuant to the antidumping duty statute, Commerce imposes duties on imported products that are sold in the United States at less than fair value, which

generally occurs when the home market price (called the normal value) exceeds the United States price (called the export price, or constructed export price if the price has to be estimated).  19 U.S.C. § 1673.  When an importer enters subject to antidumping duties, the importer generally must make a cash deposit of estimated antidumping duties.  19 U.S.C. § 1673e(a)(3).

After issuance of an antidumping duty order, Commerce determines the precise amount of duty owed during annual administrative reviews.  19 U.S.C. § 1675(a)(1), (2)(A).  If no interested party requests a review, Commerce issues liquidation instructions to CBP, directing it to assess duties at the cash deposit rate that was "required" at the time of entry.  19 C.F.R. § 351.212(c)(1).  If an interested party requests an administrative review, Commerce retrospectively determines whether dumping has occurred and the final duty rates for previously unliquidated subject entries.  19 U.S.C. § 1675(a).  Commerce also publishes new cash deposit rates for future entries, equal to the administrative review's final duty rates for earlier entries.   19 C.F.R. §§ 351.211(b)(2), 351.212(a).

The antidumping law further distinguishes between proceedings involving market and nonmarket economy countries.  19 U.S.C. §§ 1677(18), 1677b(c).  Consistent with that statutory distinction, Commerce has long recognized a presumption of state control over export activities in a nonmarket economy country, under which all exporters receive a single nonmarket economy country

2

rate, or country-wide rate, unless an exporter can affirmatively demonstrate its entitlement to a separate rate by showing independence from government control of its export activities. *See*, *e.g.*, JA170 (Policy Bulletin 05.1 at 4 (Dep't of Commerce Apr. 5, 2005), *available at* http://ia.ita.doc.gov/policy/bull05-1.pdf.

## II.   **Administrative Proceedings**

This matter involves two annual administrative reviews of the antidumping duty order on pencils from China.[3] *Certain Cased Pencils from China*, 59 Fed. Reg. 66,909 (Dep't of Commerce Dec. 28, 1994) (antidumping duty order).

The relevant pencil entries are subject to two administrative reviews, covering December 1, 2008, through November 30, 2009 (2008-09), and December 1, 2009, through November 30, 2010 (2009-10).  The uncontroverted facts show that Michaels purchased and imported pencils from Chinese companies that had not demonstrated independence from state control, but the pencils were manufactured by Chinese producers who had established independence from state control over their export activities.  *Michaels*, 931 F. Supp. 2d at 1317.

Put another way, the manufacturers placed Michaels's imported pencils into the stream of commerce in China, and separate Chinese exporters sold the pencils to Michaels and exported them to the United States.  Therefore, the dispute here

---

[3] Commerce considers China to be a nonmarket economy country. *Certain Cased Pencils From China*, 76 Fed. Reg. 2,337, 2,338-39 (Dep't of Commerce Jan. 13, 2011) (prelim. results and partial rescission), JA126-27.

3

involves the question whether the manufacturers' or exporters' rate of duty should apply to Michaels's pencil imports.

### A.   2008-09 Administrative Review

After publishing an opportunity notice in the Federal Register, Commerce received requests for review from, among other parties, China First Pencil Co., Ltd. (China First), Shanghai Three Star Stationery Industry Co., Ltd. (Three Star), and Shandong Rongxin Import and Export Co., Ltd. (Rongxin) and initiated the reviews. *Initiation of Antidumping and Countervailing Duty Administrative Reviews, Request for Revocation in Part, and Deferral of Initiation of Administrative Review*, 75 Fed. Reg. 4,770, 4,772 (Dep't of Commerce Jan. 29, 2010).

During the 2008-09 period, Michaels, an importer and retailer of arts and crafts supplies, purchased and imported pencils from China manufactured by China First and Three Star.  Michaels Br. 5-6.  It also purchased pencils from an exporter that had acquired pencils that Rongxin had sold at an earlier stage in the stream of commerce.  *See* JA193 (questionnaire response that "Rongxin is simply a sales operation.  It does not have a manufacturing plant.").  Michaels concedes that parties other than China First, Three Star, or Rongxin exported the pencils that Michaels imported, *id.*, and the trial court found (and Michaels does not contest) that there was no evidence that any of Michaels's exporters had ever established

4

eligibility for a separate rate by demonstrating independence from government control over export activities. *Michaels*, 931 F. Supp. 2d at 1317. Michaels paid cash deposits of estimated dumping duties on its imports based on the specific cash deposit rate then in place for China First, Three Star, or Rongxin, not for those required for the exporters of the merchandise from whom Michaels purchased the pencils. *Id.* at 1311. Despite being an interested party, 19 U.S.C. § 1677(9)(A), Michaels did not request a review for its exporters or any other party.

China First and Three Star withdrew their review requests, so when Commerce published the preliminary results of the 2008-09 review, it also rescinded the review for those companies. *Certain Cased Pencils From China*, 76 Fed. Reg. at 2,338. JA127. Commerce explained that, "{f}or the companies for which this review is rescinded, antidumping duties shall be assessed at rates equal to the cash deposit of estimated antidumping duties *required* at the time of entry, or withdrawal from warehouse, for consumption, in accordance with 19 C.F.R. § 351.212(c)(1)(i)." JA131 (*Id.* at 2,343) (emphasis added).

In implementing the rescission, CBP issued Administrative Message 1028303, which contained Commerce's liquidation instructions to CBP related to China First's and Three Star's sales for the 2008-09 period, directing CBP to assess antidumping duties "at the cash deposit rate or bonding rate *required* at the time of entry." A138 (emphasis added). The cash deposit instructions in effect

5

during the 2008-09 period stated: "For all PRC exporters of subject merchandise which have not been assigned a separate rate, the cash deposit rate will be the PRC-wide rate of 114.90 percent." JA78, 83, 86.

Meanwhile, Commerce continued to review Rongxin's sales. In its response to Commerce's antidumping questionnaire, Rongxin did not identify any merchandise that it "sold to another company in {China} that was ultimately shipped to the United States, or was at the time the sale intended to be shipped to the United States." JA203. Accordingly, Michaels's 2008-09 entries sold at an earlier stage of commerce in China by Rongxin and are among the subject matter of this appeal were not subject to the administrative review.

Commerce calculated a final dumping margin for Rongxin's subject entries of 0.17 percent. *Certain Cased Pencils From China*, 76 Fed. Reg. 27,988 (Dep't of Commerce May 13, 2011) (final results admin. review), JA145.

Because China-wide entity was not reviewed during this period, JA146 (*id.*, at 27,989), CBP issued Administrative Message 1196306, in which Commerce directed CBP to assess antidumping duties "at the cash deposit rate or bonding rate *in effect* at the time of entry." A159 (emphasis added). The cash deposit instructions in effect during the 2008-09 period mandated a "PRC-wide rate of 114.90 percent." JA78, 83.

Michaels contends that CBP billed it for supplemental duties at the China-wide rate of 114.90 percent *ad valorem*.  Michaels Br. 13.

**B.     2009-10 Administrative Review**

As with the preceding period, after publishing an opportunity notice in the Federal Register, Commerce received requests for an administrative review from Rongxin and an exporter not at issue here, and initiated the requested reviews. *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 76 Fed. Reg. 5,137 (Dep't of Commerce Jan. 28, 2011), JA133.  No administrative review was requested for or on behalf of China First.  *Id*.

Michaels imported pencils from China subject to the 2009-10 review that had been manufactured by China First and sold at an earlier stage of commerce in China by Rongxin.  Michaels Br. at 8; JA193.  Michaels acknowledges that parties other than China First or Rongxin exported the pencils that Michaels imported into the United States, *id.*, and as with the preceding review, no evidence exists that any of Michaels's exporters had qualified for a separate rate by showing independence from government control.  *Michaels Stores*, 931 F. Supp. 2d at 1317.  Michaels made cash deposits of estimated antidumping duties based on the cash deposit rate then in place for China First or Rongxin.  Michaels Br. at 5.  Again, Michaels did not request an administrative review for its exporters or any other party.

7

While the review was pending, CBP issued Administrative Message 1046306, which included Commerce's liquidation instructions for companies not under review for the 2009-10 period, including China First. JA142-43. Those instructions ordered CBP to assess antidumping duties "at the cash deposit rate or bonding rate *required* at the time of entry." *Id.* at 142. The cash deposit instructions in effect for 2008-09 stated that "{f}or all PRC exporters of subject merchandise which have not been assigned a separate rate, the cash deposit rate will be the PRC-wide rate of 114.90 percent." JA83, 123.

All parties withdrew their requests for review before responding to the Commerce's questionnaire, and Commerce rescinded the 2009-10 review. *Certain Cased Pencils From China*, 76 Fed. Reg. 27,990 (Dep't of Commerce May 13, 2011) (review rescission), JA148. In its decision, Commerce provided notice that it "will instruct {CBP} to assess antidumping duties on all appropriate entries at rates equal to the cash deposit of estimated antidumping duties *required* at the time of entry, or withdrawal from warehouse, for consumption, in accordance with 19 C.F.R. §351.212(c)(1)(i)." JA148 (*Id.* at 27,990) (emphasis added).

CBP then issued Administrative Message 1152309, which contained Commerce's liquidation instructions to assess antidumping duties "at the cash deposit rate or bonding rate *required* at the time of entry." JA149 (emphasis added). As with the preceding period, the cash deposit instructions in effect

8

directed that "{f}or all PRC exporters of subject merchandise which have not been

assigned a separate rate, the cash deposit rate will be the PRC-wide rate of 114.90

percent." JA83, 85, 122. As with the 2008-09 review, Michaels contends that

CBP billed it for supplemental duties at China-wide rate. Michaels Br. at 13.

## III.  Trial court Proceeding

Michaels challenged the lawfulness of Commerce's liquidation instructions

for the two periods of review. Michaels contended that the instructions were

unlawful because they resulted in the assessment of antidumping duties at the

China-wide rate rather than at rates corresponding to the producers of the subject

merchandise. The trial court sustained Commerce's liquidation instructions.

*Michaels*, 931 F. Supp. 2d at 1314-19.

Michaels contended that a Commerce regulation, 19 C.F.R. § 351.107(b)(2),

obligated the agency to impose cash deposit requirements and assess antidumping

duties at rates corresponding to the producers of the imported pencils, rather than

at rates assigned to the exporters who actually sold the merchandise to Michaels.

The trial court rejected this construction, explaining that 19 C.F.R.

§ 351.107(d), the subsection of the same regulation devoted to nonmarket economy

cases, and its history specify a different, exporter-centric treatment for nonmarket

economies, and it further traced the evolution of Commerce's presumption of state

control over export activities in nonmarket economy countries. *Michaels*, 931 F.

9

Supp. 2d at 1315-16. As a result of the presumption of state control, the trial court

recognized two important policy considerations for Commerce in the nonmarket

economy context that are reflected in the agency's regulations: (1) "that an

exporter's rate is preferable to a producer's rate as the exporter is likely the party to

set prices and know which goods are destined for the United States, and {(2)} that

each exporter has the burden of proving it is eligible for a separate rate." *Id.* at

1318. Because none of Michaels's exporters had qualified for a separate rate by

showing independence from government control, the trial court held that

Commerce lawfully issued instructions directing liquidation of the subject entries

at the China-wide rate. *Id.* at 1317-19.

## SUMMARY OF THE ARGUMENT

Commerce's liquidation instructions were lawful. Michaels's assertion that

Commerce must direct liquidation at producer (or earlier seller)-specific rates is

belied by the regulation it cites, which recognizes differential treatment in

antidumping duty proceedings involving market and nonmarket economy

countries, such as China. As the trial court explained in detail, Commerce practice

has long recognized that antidumping duties in nonmarket economy cases are to be

exporter-tied as a result of the Court-approved presumption that all export

activities are controlled by the Chinese government unless demonstrated otherwise.

Because the activities of the exporters here were government-controlled as a matter

of law, Commerce lawfully instructed CBP to assess antidumping duties and to

impose cash deposit rates at the China-wide rate.

## ARGUMENT

### I. Standard of Review

When reviewing a judgment in an action initiated under 28 U.S.C. § 1581(i),

this Court applies the standard of review set forth in 5 U.S.C. § 706. *Consol.

Bearings Co. v. United States*, 348 F.3d 997, 1004 (Fed. Cir. 2003). The Court

thus reviews the judgment *de novo*, reapplying the same standard utilized by the

trial court. The Court should sustain a challenged administrative action "arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law." 5

U.S.C. § 706(2)(A). Under this standard, the scope of review is "a narrow one."

*Bowman Transp. Inc. v. Arkansas-Best Freight Sys. Inc.*, 419 U.S. 281, 285 (1974).

The Court will not upset agency action so long as the agency "articulate{s} a

satisfactory explanation for its action including a 'rational connection between the

facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n v. State Farm Mut.

Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines, Inc. v.

United States*, 371 U.S. 156, 168 (1962)).

Pursuant to *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*,

467 U.S. 837 (1984), in considering the lawfulness of Commerce's construction of

the antidumping statute, Commerce's "interpretation governs in the absence of

unambiguous statutory language to the contrary or unreasonable resolution of language that is ambiguous." *United States v. Eurodif S.A.*, 555 U.S. 305, 316 (2009). "'{T}he whole point of *Chevron* is to leave the discretion provided by the ambiguities of a statute with the implementing agency.'" *Id.* (citation omitted). Similarly, courts are to afford an agency's interpretation of its regulations substantial deference, unless it is plainly erroneous or inconsistent with the regulations. *Torrington Co. v. United States*, 156 F.3d 1361, 1363-64 (Fed. Cir. 1998) (citing *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994)).

## II.     Commerce's Liquidation Instructions Were Lawful

Commerce issued lawful instructions to CBP to liquidate entries at the required China-wide cash deposit rate. Michaels's contention that Commerce, in the absence of a completed administrative review covering Michaels's own entries, must direct CBP to liquidate its entries at a producer-specific rate finds no support in any statute, regulation, case law, or agency practice. Michaels contends that its entries should be liquidated at the rate attributable to the producer of the subject merchandise, that is, China First, Three Star, or Rongxin as the case may be, not the exporter. Michaels Br. 16-27. Michaels erroneously minimizes the trial court's reasoned reliance on the language of the very regulation that Michaels cites for support, 19 C.F.R. § 351.107, and years of Court-approved agency practice in antidumping cases involving nonmarket economies.

12

## A. Commerce Reasonably Assigns The China-Wide Rate To Unreviewed Exporters Without A Separate Rate

The antidumping law does not specify how Commerce must assign dumping margins to reviewed and unreviewed companies. 19 U.S.C. §§ 1673d(a)(1), 1675. Using its broad authority as the "administering authority," 19 U.S.C. § 1677(1), Commerce has employed "a presumption of state control for exporters in a non-market economy." *Sigma*, 117 F.3d at 1405. Under that presumption, all exporters receive a single nonmarket economy country rate, or country-wide rate, unless an exporter can "'affirmatively demonstrate' its entitlement to a separate, company-specific margin by showing 'an absence of central government control, both in law and in fact, with respect to exports.'" *Id.* (citations omitted); *see also Transcom, Inc. v. United States*, 294 F.3d 1371, 1378 (Fed. Cir. 2002) (sustaining notice that "all other exporters" not explicitly named in initiation would be subject to China-wide rate); *Coalition for the Preservation of Am. Brake Drum & Rotor Aftermarket Mfrs. v. United States*, 44 F. Supp. 2d 229, 242 (Ct. Int'l Trade 1999); *Royal United Corp. v. United States*, 714 F. Supp. 2d 1307, 1310 (Ct. Int'l Trade 2010).

Should an exporter from a nonmarket economy country demonstrate an absence of *de jure* and *de facto* government control over its export activities, then it becomes eligible for a separate rate. *Sigma*, 117 F.3d at 1405. The presumption of state control over export activities in nonmarket economy proceedings dates

13

back over two decades, *Michaels Stores*, 931 F. Supp. 2d at 1316, n.17, and has been applied consistently since then in proceedings involving nonmarket economy countries.  *See*, *e.g.*, *Sparklers from the People's Republic of China*, 56 Fed. Reg. 20,588 (Dep't of Commerce May 6, 1991) (final antidumping investigation determination) (*Sparklers*); *Brake Rotors From the People's Republic of China*, 64 Fed. Reg. 61,581, 61,583 (Dep't of Commerce Nov. 12, 1999) (final admin. rev. results) (*Brake Rotors*); Policy Bulletin 05:1.  Thus, antidumping duties in nonmarket economies have long been exporter-tied, and exporters are presumed part of a single, government-controlled entity absent a showing of independence.

### B.  Commerce's Regulation Mandates Assignment Of The China-Wide Rate To Unreviewed Exporters Without A Separate Rate

Michaels relies exclusively on 19 C.F.R. § 351.107(b)(2) to contend that, absent an administrative review of the exporter, Commerce must apply the cash deposit rate for the producer.  Michaels Br. 16-25.  This subsection, in relevant part, directs that the "rate established for the producer" applies when Commerce has "not established previously . . .  a noncombination rate for the exporter in question . . ."  19 C.F.R. § 351.107(b)(2).  Michaels's reliance on 19 C.F.R. § 351.107(b)(2) is misplaced for two reasons.

First, the heading of section 351.107(b)(2) refers to "New supplier."  Under Michaels's plain-language reading, the reference to "New supplier" demonstrates

14

that the regulation applies only to new shipper reviews conducted under 19 U.S.C.

§ 1675(a)(2)(B).  This is not a new shipper case.

More importantly, Michaels ignores that 19 C.F.R. § 351.107 includes a

separate subsection addressing the establishment of cash deposit rates for

nonmarket economies, which mandates that rates "may consist of a single dumping

margin applicable to all exporters and producers":

> Rates in antidumping proceedings involving nonmarket
> economy countries.  In an antidumping proceeding
> involving imports from a nonmarket economy country,
> ''rates'' may consist of a single dumping margin
> applicable to all exporters and producers.

19 C.F.R. § 351.107(d).  Thus, the same regulation on which Michaels relies

reflects the very presumption of state control over export activities in nonmarket

economies that may necessitate assigning all exporters a single rate, which in turn

directs Commerce to concentrate review on exporters' pricing behavior, not

producers.  In sum, the regulation on which Michaels bases its claim undermines

that claim.

Michaels nonetheless contends that section 351.107(b)(2) is unambiguous

and contains no exceptions for nonmarket economies.  Michaels Br. at 18-22.

Unlike Michaels, which reads sections 351.107(b)(2) and (d) in complete isolation,

the trial court reasonably held that section 351.107(d) informs any analysis of

15

351.107(b)(2) in light of the presumption of state control over export activities. *Michaels Stores*, 931 F. Supp. 2d at 1317.

To illustrate why section 351.107 should be read as a whole, the heading for 19 C.F.R. § 351.107 reads, "Cash deposit rates for non-producing exporters; rates in antidumping proceedings involving a nonmarket economy." Leaving aside the text of § 351.107(d), which itself establishes a regime unique for nonmarket economies, the heading identifies a distinction between market and nonmarket economy countries in how Commerce should determine cash deposit rates. Moreover, the inclusion of a specific subsection within 19 C.F.R. § 351.107 to address nonmarket economies is similar to the structure of 19 U.S.C. § 1677b, which includes a single subsection differentiating the methodology to be used in calculating normal value in market economy countries and nonmarket economy countries. 19 U.S.C. § 1677b(c). Accordingly, and contrary to Michaels's assertion that 19 C.F.R. § 351.107(b)(2) is an impermissible implied exception, Michaels Br. at 19, the differential treatment for market and nonmarket economies is embedded in both the text and structure of the regulation.

Indeed, reading sections 351.107(b)(2) and (d) in isolation from each other, as Michaels does, blurs the distinctions between market and nonmarket economies mandated by Congress and longstanding practice. The statute is silent on any distinction between assessment rates for market and nonmarket economies.

16

Michaels Br. at 21.  It is also silent with respect to the assignment of dumping margins to reviewed and unreviewed companies.  Of course, it is axiomatic that "whenever the statute is silent on a particular issue, Commerce may 'formulate policy and make rules 'to fill any gap left, implicitly or explicitly, by Congress,''" *Michaels*, 931 F. Supp. 2d at 1315 (citing *SKF USA Inc. v. United States*, 254 F.3d 1022, 1030 (Fed. Cir. 2001) (quoting *Chevron*, 467 U.S. at 843), and Commerce did exactly that by promulgating section 351.107(b)(2) to address market economy cases and 351.107(d) in the nonmarket economy context.

### C.  Commerce's Practice Mandates Assignment Of The China-Wide Rate To Unreviewed Exporters Without A Separate Rate

Michaels further contorts Commerce's practice in determining the margin to assign to exporters that have demonstrated independence from government control to contend that the same treatment should be given to government-controlled exporters, such as Michaels's exporters.  Michaels Br. at 21.  Contrary to Michaels's characterization, Commerce does not "apply" the market economy "all-others" rate provision of 19 U.S.C. § 1673d(c)(5) in nonmarket economy cases.  Instead, Commerce explained that the statute is silent on the method to determine dumping margins for companies that demonstrate *independence from government control* over their export activities in nonmarket economy proceedings and has looked to 19 U.S.C. § 1673d(c)(5) for guidance to fill this statutory gap.

17

*Certain Frozen Warmwater Shrimp From Vietnam*, 73 Fed. Reg. 52,273, 52274

(Dep't of Commerce Sept. 9, 2008) (final admin. rev. results); *Amanda Foods*

*(Viet.) Ltd. v. United States*, 647 F. Supp. 2d 1368, 1379-80 (Ct. Int'l Trade 2009).

In sum, Commerce's treatment of non-government controlled exporters cannot

govern Michaels's own government-controlled exports.  And moreover, that

methodologies in market and nonmarket economy proceedings sometimes coincide

does not mandate that they must always do so.

In addition to the regulation's plain language and structure, Commerce

explained its implementation of 19 C.F.R § 351.107(d) and its practice in the

regulations' preamble.  *Antidumping Duties; Countervailing Duties*, 62 Fed. Reg.

27,296 (Dep't of Commerce May 19, 1997) (final rule) (Preamble).  Commerce

explained that it imposes duties on sales made by nonmarket economy trading

company exporters at the rate determined for the exporter, not the producer:

> Another instance in which {Commerce} assigns rates to exporters is in {antidumping} investigations and reviews of imports from nonmarket economies (NMEs).  In those cases, if sales to the United States are made through an NME trading company, we assign a noncombination rate to the trading company regardless of whether the NME producer supplying the trading company has knowledge of the destination of the merchandise.

62 Fed. Reg. at 27,303. Commerce thus reiterated that it "intend{ed} to continue calculating {antidumping} rates for NME export trading companies, and not the manufacturers supplying the trading companies." *Id.* at 27,305.

Michaels attempts to resist Commerce's clear explanation, Michaels Br. 22-23, but the Preamble confirms the long-running presumption of state control over export activities and illustrates why Commerce determines assessment rates in nonmarket economy proceedings based on the exporter's behavior. As the trial court explained, nothing in 19 C.F.R. § 351.107 altered Commerce's practice in nonmarket economy cases. *Michaels Stores*, 931 F. Supp. 2d at 1316- 19.

Michaels also attempts to discount the Preamble because it refers to "trading companies," which may be distinct from a larger category of "nonproducing exporters." Michaels Br. at 24-25. Michaels fails to explain the significance of this distinction and, indeed, its reference to "'nonproducing exporters that are not trading companies, such as original equipment manufacturers,'" *id*. at 24 (quoting Preamble, 62 Fed. Reg. at 27,303), only demonstrates that Michaels's exporters, from whom it purchased Chinese pencils at a stage of commerce long after manufacturing was complete, cannot fall into the category envisioned in the Preamble. Rather, from its own description, Michaels's exporters resemble trading companies. *Id*. at 8 (describing exporters as "Chinese vendor{s}.").

### D. The Trial Court Reasonably Concluded That Section 351.107(b)(2) Harms Rather Than Supports Michaels's Claim

Michaels also contends that the trial court wrongly characterized the China-wide rate as a "noncombination rate" for nonproducing government-controlled exporters, but offers no legal support for its position. As Michaels concedes, section 351.107(b)(2) does not define "noncombination rate." Michaels Br. at 26-27. Michaels asserts, without explanation or authority, that "{n}oncombination rate simply means a calculated rate specific to one entity." *Id.* It is unclear how Michaels reaches this conclusion, when the regulatory definition of "combination rate" lacks any such language, 19 C.F.R. § 351.107(b)(1)(i), and the regulation lacks any definition of a "*non*combination rate." *Id.*

If a noncombination rate is understood as the universe of rates excluding "combination rates," which reflect a combination of the exporter and its supplying producer(s), *id.*, the trial court logically characterized the China-wide rate be a *non*combination rate. *Michaels*, 931 F. Supp. 2d at 1315-17. Indeed, the regulation directs that the "rate established for the producer" applies only when Commerce has "*not established previously . . . a noncombination rate for the exporter in question . . .*" 19 C.F.R. § 351.107(b)(2). Accordingly, the trial court was perfectly reasonable in holding that Commerce *had* already established a "noncombination rate" for Michaels's exporters by determining a rate for the

20

China-wide entity, because all export activities are under government control as a matter of law until proven independent, regardless of the identity of the producer.

### E.    Michaels's Other Arguments Are Unpersuasive

Michaels's other assertions are unavailing.  Michaels contends that Commerce has inconsistently applied section 351.107(d).  Michaels Br. 27-30. This is wrong.  The Court has acknowledged that Commerce's nonmarket economy policy and presumption of state control over export activities dates back to 1991.  *See Transcom*, 294 F.3d at 1373 (again sustaining practice that nonmarket economy "exporters would be subject to a single, countrywide antidumping duty rate unless they could demonstrate legal, financial, and economic independence from the Chinese government.").

Michaels nevertheless cites two examples in which it contends that Commerce departed from its practice, but neither is illustrative.  Michaels refers to earlier cash deposit instructions for pencil imports from China that used the term "manufacturers/exporters."  Michaels Br. at 28.  Aside from ignoring the numerous times when Commerce has articulated its nonmarket economy policy in published notices (and the instructions in this case), Michaels fails to explain how use of this terminology in those cash deposit instructions constitutes a departure of practice instead of isolated aberrations that were remedied in later instructions.  Michaels's reliance on Court of International Trade decisions arising from other parties'

challenges to liquidation instructions in an earlier pencils administrative review is also unpersuasive. Those preliminary injunctions simply acknowledged potential ambiguities in liquidation instructions from a different administrative review with different facts. Michaels Br. at 29, n.17 (citing *Walgreen Co. v. United States*, Slip Op. 2010-142, 2010 Ct. Intl. Trade LEXIS 145, *7-*8 (Ct. Int'l Trade Dec. 23, 2010); *Target Corp. v. United States*, Slip Op. 2010-141, 2010 Ct. Intl. Trade LEXIS 146, *7-*8 (Ct. Int'l Trade Dec. 23, 2010)). Michaels misattributes their importance, given that those cases involve wholly different facts in which the trial court held that some of the plaintiffs' entries may have, in fact, been reviewed by Commerce. *See*, *e.g.*, *Walgreens*, slip op. at 5 ("most if not all of the entries at issue involved sales which formed the bases for Commerce's customer specific rates for the involved manufacturer").

Michaels's second example similarly fails. Michaels contends that, by specifying that a clarification of Commerce's reseller policy applied only to market economies, Commerce implicitly conceded that 19 C.F.R. § 351.107(b)(2) applies equally to proceedings involving nonmarket economies. Michaels Br. at 30. Commerce did no such thing. Because of the presumption of state control over export activities and the potential for parties in nonmarket economy proceedings to seek to benefit from a refinement to Commerce's market economy practice, Commerce emphasized that the refinement applied only in market economy cases.

22

*Antidumping and Countervailing Duty Proceedings: Assessment of Antidumping Duties*, 68 Fed. Reg. 23,954, 23,961 (Dep't of Commerce May 6, 2003).

Commerce recent extension of its reseller clarification to companies with separate rates in nonmarket economy cases further supports the lawfulness of the liquidation instructions here. *Non-Market Economy Antidumping Proceedings: Assessment of Antidumping Duties*, 76 Fed. Reg. 65,694 (Dep't of Commerce Oct. 24, 2011). Although that refinement does not apply to either review here, it again reiterates Commerce's longstanding policy that, "if an exporter does not receive a separate rate, the NME-wide rate applies as the cash deposit rate at the time of entry to entries of merchandise it exports." *Id.* at 65,694.

In sum, the trial court correctly sustained the imposition of rates specific to the presumptively Chinese government controlled exporters of the subject merchandise here, not the producers.

## III. New Arguments Raised By Michaels For The First Time On Appeal Have Been Waived And Lack Merit

Michaels raises two additional contentions challenging the trial court's final judgment for the first time on appeal: (1) that Commerce failed to comply with the Administrative Procedure Act (APA); and (2) that Commerce's interpretation of its regulations would be unfair for importers relying upon the plain language of the regulations. Michaels Br. 30-34.

23

Michaels waived both arguments. "Arguments not made in the court or tribunal whose order is under review are normally considered waived." *Gant v. United States*, 417 F.3d 1328, 1332 (Fed. Cir. 2005); *see also Caterpillar Inc. v. Sturman Indus.*, 387 F.3d 1358, 1368 (Fed. Cir. 2004) ("If a party fails to raise an argument at trial, it waives any appeal of that issue because, barring a few exceptions, an appellate court does not consider arguments first made on appeal.") (citing *Datamatic Servs. v. United States*, 909 F.2d 1029, 1034 (7th Cir. 1990)). Indeed, "a party's argument should not be a moving target." *Interactive Gift Exp., Inc. v. Compuserve Inc*., 256 F .3d 1323, 1346 (Fed. Cir. 2001) (citation omitted).

Michaels raised neither contention below, a fact that it fails to acknowledge to the Court. *See* Michaels's trial court briefs, dckt. nos. 33, 43. Moreover, Michaels offers no explanation why the Court should consider its contentions for the first time. Having waived these issues below, Michaels should be precluded from raising them on appeal.

Notwithstanding this waiver, even assuming that Michaels had provided the trial court the opportunity to address these new contentions, neither would have any merit.

First, by its express terms, the APA does not apply to "interpretive rules, general statements of policy, or rules of agency organization, procedure, or practice." 5 U.S.C. § 553(b)(3)(A). It is also well-established that the APA does

24

not apply to antidumping proceedings because they are largely investigative, and not adjudicatory. *See* Statement of Administrative Action accompanying the Uruguay Round Agreements Act, H.R. Doc. 103-316 (1994) at 892 ("Antidumping and countervailing duty proceedings . . . are investigatory in nature."); *see also GSA, S.R.L. v. United States*, 77 F. Supp. 2d 1349, 1359 (Ct. Int'l Trade 1999) ("the APA does not apply to antidumping administrative proceedings."). Thus, the manner in which Commerce interprets its regulations and any policy statements related to its presumption of state control over export activities in nonmarket economy antidumping proceedings are not subject to the APA.

In contrast, the APA requires administrative agencies to provide interested parties with notice and an opportunity to comment on proposed rulemaking. 5 U.S.C. § 553(c). Rulemaking is the "agency process for formulating, amending, or repealing a rule," and a rule is "an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy." 5 U.S.C. § 551(4), (5). As shown by the Preamble, Commerce provided this opportunity when it adopted 19 C.F.R. § 351.107. 62 Fed. Reg. at 27,303.

Similarly, Commerce's notice-and-comment rulemaking, as reflected in the Preamble, and Commerce's long-standing, Court-approved presumption of government control over export activities in nonmarket economies disposes of Michael's assertion of detrimental reliance. Because parties have been on notice

25

since 1991 that Commerce's assessment of antidumping duties is tied to the

behavior of the exporter and whether it has demonstrated independence from

government control, it is difficult to conclude that Michaels lacked notice. In any

event, Michaels never attempted to proffer evidence supporting this factual claim.

## <u>CONCLUSION</u>

For these reasons, we respectfully request that the Court affirm.

Respectfully submitted,

STUART F. DELERY
Assistant Attorney General

JEANNE E. DAVIDSON
Director

/s/ PATRICIA M. McCARTHY
Assistant Director

OF COUNSEL:
DANIEL J. CALHOUN
Senior Attorney
Office of the Chief Counsel
  for Trade Enforcement and Compliance
U.S. Department of Commerce

/s/ STEPHEN C. TOSINI
Senior Trial Counsel
Department of Justice
Civil Division
Commercial Litigation Branch
P.O. Box 480, Ben Franklin Station
Washington, D.C. 20530
Tel: (202) 616-5196
Fax: (202) 514-7969
stephen.tosini@usdoj.gov

March 20, 2014

Attorneys for Defendant-Appellee

## CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on this day, March 20, 2014,

"BRIEF OF DEFENDANT-APPELLEE, THE UNITED STATES" was filed

electronically.  This filing was served electronically to all parties by operation of

the Court's electronic filing system.

/s/  Stephen C. Tosini

# **CERTIFICATE OF COMPLIANCE**

Pursuant to FRAP 32(a)(7)(B), I certify that the foregoing brief contains 5,567 words, excluding the parts of the brief exempted by the rule. The brief complies with the typeface requirements and type style requirements of FRAP 32(a)(5) and has been prepared using Times New Roman 14 point font, proportionally spaced typeface.

<u>/s/ Stephen C. Tosini</u>